[No. B070823. Second Dist., Div. Four. July 24, 1995.]

MARGARET LINDSAY-FIELD et al., Plaintiffs and Appellants, v. ED FRIENDLY et al., Defendants and Appellants.

## COUNSEL

Langberg, Leslie & Gabriel, Barry B. Langberg, Joseph M. Gabriel, Dwayne Watts, James M. Duenow and Kathlene Bonnigson for Plaintiffs and Appellants.

Gibson, Dunn & Crutcher, Robert Forgnone, Shauna Weeks, Richard G. Flanagan, Nolan B. Henderson and Vanessa Comerford for Defendants and Appellants.

## OPINION

## VOGEL (C. S.), J.—

### INTRODUCTION

Defendants are members of the Naevus Syndicate which owned a stallion named Naevus, retired from racing to stud. Plaintiffs are Australian horse breeders and their joint venturer, who negotiated an agreement with the manager of the Naevus Syndicate to have Naevus transported to Australia to breed with mares there during the Southern Hemisphere breeding season. At a meeting of the Naevus Syndicate called for the purpose of approving or disapproving the proposed contract, it was voted down. Plaintiffs brought this action for breach of contract, contending that the contract negotiated with the syndicate manager was binding on the members despite its rejection at the members' meeting. A jury by special verdict awarded a judgment in favor of plaintiffs, against only those syndicate members who, prior to the syndicate meeting, indicated approval of the proposal in a poll conducted by the manager. The verdict awarded damages totaling $400,000, which the trial court divided into portions against the defendants severally, based on their respective ownership interests.

On defendants' cross-appeal from the judgment, we reverse, agreeing with defendants that the syndicate manager lacked authority to enter a contract binding on the members. This renders moot plaintiffs' appeal in which they contend the damages were inadequate and the judgment should have been joint and several.

## FACTS

Under the Naevus Syndicate agreement, ownership of the horse Naevus is in 40 undivided fractional shares, the relationship of the members to each other being tenants in common.[1] Each share owner is entitled to nominate a mare for breeding with Naevus during the customary breeding season, with a normal book of 45 mares per season. Defendant J. R. "Dick" Sturgis is syndicate manager and also owner of 21 shares. The other member owners are: Cecilia Straub (Michael Cooper trustee), Ed Friendly, John Fulton, Jacque Fulton, Carl Cannata, Olivia Cannata, Leonard Rubinstein, Frank Lerner, Milt Israel and the Command Hostess Partnership. The syndicate agreement sets forth the relationship of the members to the syndicate manager as principal and agent, and the rights, duties, and authority of the manager. The manager has possession of the horse and reasonable authority and discretion concerning ordinary care and supervision.

The agreement provides that meetings of the members to consider any matter which may properly be the subject of member action may be called on 10 days' notice. At a meeting, a majority vote controls, except that any matter requiring termination, cancellation, alteration, amendment, or modification of the agreement requires 75 percent approval. Any action which members are authorized to take at a meeting may be taken without a meeting if there is *unanimous* consent, in writing. (Art. V, § 5.2 and art. VIII.) In practical effect, this enables any member to require a meeting by withholding his or her consent.

Plaintiffs Margaret Lindsay-Field and Tim Lindsay-Field, Australian horse breeders, formed a joint venture with plaintiff Robert Porter, a "bloodstock agent" residing in the United States. They became interested in having Naevus transported to Australia to be bred with mares there during the Southern Hemisphere breeding season, which is opposite the normal breeding season in the United States. Porter negotiated with Sturgis to obtain such an agreement.

Porter wrote a letter to Sturgis dated June 4, 1987, setting forth the terms of plaintiffs' offer. Plaintiffs contend Sturgis signed and accepted this offer

---

[1] The special verdict found the Naevus Syndicate was a tenancy in common, not a partnership as contended by plaintiffs at trial.

on behalf of the members on June 8, 1987. This is the contract on which plaintiffs relied at trial and which defendants contended was not binding because Sturgis lacked authority to bind the members without a meeting or unanimous written consent.

Pertinent terms of this proposal were that Naevus be placed in quarantine in the United States by June 15, 1987, so that he could be transported July 15, 1987, in order to be out of Australian quarantine by the beginning of the Southern Hemisphere breeding season, about September 7, 1987; that plaintiffs "lease" Naevus for the 1987 Southern Hemisphere season, for a price of $100,000, payable $20,000 in July 1987 and $80,000 in April 1988; that plaintiffs have an irrevocable option to purchase, for $550,000 in June 1988, the irrevocable and exclusive right to Naevus's services in the Southern Hemisphere for Naevus's lifetime; that if such option was exercised Naevus would be transported to Australia every July 15 and transported back to California every January 15; and that if the option was exercised 40 class B shares would be issued.

This proposal altered drastically the nature of Naevus's stud service, the rights of the members and the basic terms of the Naevus Syndicate agreement. Clearly it required approval by the members and amendment of the Naevus Syndicate agreement in a manner specified by the syndicate agreement, and was not a matter committed to Sturgis's sole discretion like ordinary maintenance and supervision. Plaintiffs do not appear to contend otherwise, but rather contend that Sturgis received actual authority from a poll he took of the members, as follows.

In anticipation of the agreement, Sturgis sent a letter to all the syndicate members on June 3, 1987. This was before he received the June 4 written offer from Porter, and so his June 3 letter to the members did not include the June 4 letter on which plaintiffs rely. Rather, Sturgis told the members, "As NAEVUS Syndicate Manager, I have negotiated a proposed agreement to sell the southern hemisphere breeding rights in Naevus to Tarcutta Farms of New South Wales, Australia. [¶] A contract is being drawn for execution, subject to syndicate approval, but since the horse must enter quarantine on June 15, if the deal is made, I am asking for your vote now based on the following [setting forth seven basic terms of the deal]." Sturgis opined in his letter that "this is a pretty good deal for the use of the horse during a time of the year that he is of no use to us . . . ." Sturgis enclosed a ballot to be returned by the members by express mail as soon as possible. The ballot stated, "Regarding the proposal to sell the southern hemisphere breeding rights in Naevus to Tarcutta Farms of New South Wales, Australia. [¶] I vote:_____"

The following members returned the ballot indicating yes or favorable: Friendly, Jacque Fulton, Carl Cannata, Olivia Cannata, Rubinstein, Lerner, Israel, and Command Hostess Partnership.

John Fulton failed to return the ballot. Michael Cooper on behalf of Cecilia Straub, representing five of the syndicate's forty shares, returned the ballot marked "no" and wrote a letter to Sturgis stating that for a proposal of such magnitude Cooper desired a meeting of all the members.

Sturgis and other members testified at trial that they interpreted Sturgis's letter and the ballot as merely authorizing Sturgis to continue negotiating a formal agreement to be submitted for member approval at a meeting, and to place Naevus in quarantine pending approval.

Porter admitted knowing a vote of the members was required. Porter testified that Sturgis informed Porter of the poll, indicating he had approval of more than 75 percent. Based on what Sturgis told him, Porter believed Sturgis was authorized to sign an agreement. Porter did not ask for any written evidence of Sturgis's authority, nor did he ask to see the Naevus Syndicate agreement. Sturgis testified he at all times indicated to Porter that an agreement was subject to syndicate approval.

On June 8, 1987, Sturgis signed his name on the line at the bottom of Porter's June 4 letter, which stated, "Agreed and accepted: by: _____ On behalf of the Owners, As Authorized." However, Sturgis handwrote an asterisked footnote stating, "subject to Purchasers working out a suitable quarantine agreement with Lakeview Farm and subject to the parties executing a more formal agreement, which agreement shall be substantially in accordance with the terms of this letter." Porter testified that he ignored this footnote, which seemed to him redundant and meaningless in light of paragraph 14 of Porter's letter which stated, "While it is intended that a more formal and more detailed agreement be negotiated between the parties hereto containing the above and other mutually agreed conditions, until such more formal agreement is executed by both of the parties hereto, this Agreement shall remain in full force and effect and shall inure to the benefit of the parties hereto."

On June 12, Sturgis gave notice to the members that a meeting would be held July 10, 1987, to consider a proposal to license Naevus to breed in the Southern Hemisphere for the sum of $100,000 for the 1987 Southern Hemisphere breeding season and, if the license was extended, for an additional $450,000 for breeding rights for the Southern Hemisphere breeding seasons for the remaining stud life of the stallion. Along with the notice, Sturgis

included a copy of, not Porter's June 4 letter but Sturgis's subsequent counterdraft, known at trial as "the Dear Bob letter," which was based on language recommended by Sturgis's attorney.

At the July 10 meeting, the members decided not to go forward with the proposal. There was general agreement that various unresolved problems and risks to the horse made the proposal not worth the benefits.

At trial the jury returned a special verdict finding that when Sturgis signed the June 4, 1987, agreement he was authorized, or his action was ratified, by members Sturgis, Friendly, Jacque Fulton, Carl Cannata, Olivia Cannata, Rubinstein, Lerner, Israel, and Command Hostess Partnership but *not* by Cecilia Straub or John Fulton. The jury found all members liable *except* Cecilia Straub and John Fulton. Clearly the jury based its verdict on the ballots returned in response to Sturgis's June 3 letter.

## DISCUSSION

In the absence of showing ostensible authority, persons dealing with an assumed agent are bound at their peril to ascertain the extent of the agent's authority. (*South Sacramento Drayage Co.* v. *Campbell Soup Co.* (1963) 220 Cal.App.2d 851, 857 [34 Cal.Rptr. 137].)

Plaintiffs could not show ostensible authority. Porter repeatedly admitted that he knew a vote of the membership was required. Porter dealt with no owners other than Sturgis and Jacque Fulton. Porter made clear at trial that to the extent he believed Sturgis had authority, it was based on what Sturgis told him about the poll. Porter did not ask for written evidence of Sturgis's authority nor did Porter ask to see the terms of the Naevus Syndicate agreement. Ostensible authority of an agent cannot be based on the agent's conduct alone; there must be evidence of conduct by the principal which causes a third party reasonably to believe the agent has authority. (*Petersen* v. *Securities Settlement Corp.* (1991) 226 Cal.App.3d 1445, 1452 [277 Cal.Rptr. 468]; *South Sacramento Drayage Co.* v. *Campbell Soup Co., supra*, 220 Cal.App.2d at pp. 856-857.) Porter made clear he did not act based upon conduct of the members causing him reasonably to believe Sturgis had authority.

Plaintiffs primarily contend the ballots returned by defendants gave Sturgis *actual* authority to enter a contract on their behalf. This argument fails to avoid fatal defects in plaintiffs' case. A cotenant has no authority to bind another cotenant with respect to the latter's interest in common property (*Williams* v. *Tam* (1900) 131 Cal. 64, 67 [63 P. 133]

[cotenancy of a horse]), except as they may have agreed between them. (*King* v. *Oakmore Homes Assn.* (1987) 195 Cal.App.3d 779, 783 [241 Cal.Rptr. 140].) ▆▆▆ The members who returned favorable ballots had no authority to bind the objecting cotenants, except in accordance with the syndication agreement. (*King* v. *Oakmore Homes Assn.*, *supra*, 195 Cal.App.3d at p. 783.) The return of ballots failed to confer actual authority on Sturgis to sign an agreement on the syndicate members' behalf, because the return was not unanimous. The syndicate agreement required a meeting of the members unless there was unanimous written consent without a meeting. Cooper's objection on behalf of Straub, and John Fulton's failure to return a ballot, prevented unanimity and required that the members act at a meeting. At the meeting the members, after discussing the pros and cons, voted against entering a contract.

Plaintiffs contend that article VIII of the syndicate agreement, which requires a 75 percent vote to amend the agreement or to sell the horse and all fractional interests, does not require a meeting.[2] Article VIII, however, must be read in light of and together with article V. (Civ. Code, § 1641.) Article V, section 5.2(b) provides, "*Except as otherwise provided herein*, the vote of a majority of the Members . . . at the meeting . . . shall decide all questions properly submitted. . . ." (Italics added.) Article V, section 5.2(c) provides: "Any action which Members are authorized to take at a meeting may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all Members and such consent shall have the same force and effect as a unanimous vote of the Members." Article VIII provides that important matters such as involved here require a super majority vote rather than a simple majority. Article VIII does not negate the requirement of article V that actions not taken at a meeting be by unanimous written consent. Rather article VIII constitutes an express exception to the simple majority provision of article V, section 5.2(b).

The jury's solution of simply letting Straub and John Fulton off the hook of liability is no solution at all. This was not an agreement by individual members to sell their shares. It was a contract requiring that Naevus go to Australia. It could not be satisfied by sending 85 percent of the horse to Australia. Either there was a contract binding all the members of the syndicate under the rules of the syndicate agreement, or there was no binding contract.

---

[2]Article VIII provides: "This Agreement and the Syndicate created hereunder may be terminated, cancelled, altered, amended, or modified in any manner or respect with the affirmative vote of the holders of seventy-five percent (75%) or more of the Undivided Fractional Interests. It is further agreed that the Horse and all Undivided Fractional Interests will be sold upon the affirmative vote of the holders of seventy-five percent (75%) or more of the Undivided Fractional Interest, at a price and terms designated by such holders so voting affirmatively."

There was no binding contract because the members voting yes had no authority to bind the other cotenants, except as provided in their agreement, and the agreement's requirements for unanimous written consent or 75 percent at a meeting were not satisfied. The proposed contract vitally affected the interests of the nonapproving members. The approval received by Sturgis in the ballot was not sufficient, under the syndicate agreement, to authorize Sturgis to contract, therefore there was no binding contract and no breach justifying any judgment against the defendants the jury found liable. (See *King* v. *Oakmore Homes Assn.*, *supra*, 195 Cal.App.3d 779, 782-783 [without evidence of authority from one cotenant, the other cotenant's vote in favor of extending restrictions on property was not a valid vote].)

▮ Because the return of favorable ballots by less than all the members could not confer actual authority on Sturgis, neither could it constitute ratification. Subsequent ratification of an agent's act by a principal requires that the principal ratify with full knowledge (Civ. Code, § 2314) and "only in the manner that would have been necessary to confer an original authority for the act ratified." (Civ. Code, § 2310.) The principal cannot ratify if the principal lacks power to confer authority. (Civ. Code, § 2312.)

Alternatively, plaintiffs argue that *all* the owners effectively ratified the contract by silent acquiescence and failure to immediately repudiate it. There is no merit to this argument. Plaintiffs rely on a June 29, 1987, letter which Porter wrote to all the owners requesting copies of their insurance policies. It stated in part, "Pursuant to the agreement reached between the Tarcutta Station Syndicate of Tarcutta N.S.W., Australia and the Owners of Naevus, Mr. Dick Sturgis has authorized me to procure from the various owners who have their shares in Naevus insured, copies of those insurance policies so that we can arrange additional insurance coverage during Naevus' visit to Australia. [¶] Since Naevus is already in quarantine pending shipment to Australia on July 15, your most URGENT response is mandatory if you wish to have this additional coverage on your share(s), and have it paid for by the Australian syndicate." Plaintiffs contend that this letter asserted the existence of an agreement, to which none of the owners objected, and most returned copies of their insurance policies. Under the circumstances, however, this cannot reasonably be construed as ratification of the existence of a binding contract. By the time of Porter's June 29, letter, the members had received notice from Sturgis that a members' meeting was set for July 10 to consider the proposal. Porter's reference to "the agreement reached" would not reasonably lead the members to think that an objection must be voiced immediately to Porter. Porter's own June 29 letter concluded, "Looking forward to receiving the above and meeting you at the Shareholders meeting on July 10." The members' failure to object to Porter before the meeting

cannot constitute ratification by silence, because under the circumstances the meeting was the proper time and place to object. In other words, even assuming ratification by silence can arise where a principal fails " ' "to repudiate the act as soon as he is fully informed of what has been thus done in his name" ' " (*Hale* v. *Farmers Ins. Exchange* (1974) 42 Cal.App.3d 681, 692 [117 Cal.Rptr. 146]), the members were not fully informed until the July meeting.

Our holding that there is no evidence Sturgis had authority to enter a contract binding on the members of the syndicate, nor evidence of ratification in the manner required by the syndication agreement, shows that the trial court erred in denying defendants' motion for judgment notwithstanding the verdict, in which defendants raised this argument. The judgment should therefore be reversed with directions that judgment be entered for defendants. (Code Civ. Proc., § 629; see *Bank of America* v. *Superior Court* (1990) 220 Cal.App.3d 613, 624-626 [269 Cal.Rptr. 596].)

## DISPOSITION

The judgment is reversed with directions that the trial court enter judgment for defendants notwithstanding the verdict. Plaintiffs' appeal from the judgment is dismissed as moot. Costs on appeal are awarded to defendants.

Epstein, Acting P. J., and Hastings, J., concurred.