[No. A068421. First Dist., Div. Five. Dec. 13, 1995.]

CALIFORNIA INDEMNITY INSURANCE PREMIUM FINANCE
COMPANY, Plaintiff and Appellant, v.
FIREMAN'S FUND INSURANCE COMPANY, Defendant and
Respondent.

COUNSEL

Raymond A. Greenberg, Todd F. Haines and Joshua N. Willis for Plaintiff and Appellant.

Bruce K. Denebeim as Amicus Curiae on behalf of Plaintiff and Appellant.

Ewell & Levy, Arthur D. Levy and Douglas Cole Grijalva for Defendant and Respondent.

OPINION

**PETERSON, P. J.**—This appeal raises a difficult legal issue from the arcane world of insurance premium financing. When an insurance agent arranges a fraudulent insurance premium financing transaction for an insured which purports to be—but is not—authorized or ratified by the insured, is the risk of liability for the insured's subsequent loss of premium borne by

the insurer issuing the original policy to the insured? Or is this risk borne by the lender relying on that agent's purported but fraudulent authorization in financing the policy premium?

We conclude the trial court properly found the lender must bear the loss in this situation, because the transaction was not, in fact, authorized by the insured; and the documentation for the transaction was signed by an agent who was not, in fact, authorized to sign "on behalf of" the insured he purportedly acted for, as required under the terms of Insurance Code section 673.

## I. FACTS AND PROCEDURAL HISTORY

The relevant facts may be briefly stated, and in large part were stipulated to by the parties. In 1992, an insurance agent (R. James Fries) used unauthorized premium financing transactions in an attempt to convert funds to his personal use, to try to stave off his inevitable bankruptcy. The issue here is how the financial responsibility for losses occasioned by these unauthorized premium financing transactions is to be apportioned to one of the unfortunate parties not involved in Fries's fraudulent scheme.

A typical insurance premium financing transaction proceeds as follows. An insured takes out a policy for a term, such as a year or more, and is charged a lump-sum premium by the insurer, which in this case was respondent Fireman's Fund Insurance Company (Fireman's Fund). To obviate a lump-sum payment for the entire full term premium, the insured can secure premium financing from a lender specializing in these transactions, such as appellant California Indemnity Insurance Premium Finance Company (CII). The insured then uses the proceeds provided by CII to pay the full premium and repays CII in amortized monthly payments. As security for those monthly payments, CII holds as collateral the unearned premium of the policy, which is the amount the insurer is obligated to refund to the insured on cancellation of the policy prior to the expiration of its term of coverage. To implement this security, CII takes an assignment of the insured's right to cancel the policy and receives the cash proceeds of the unearned premium. That assignment requires that the insured, or an insurance agent authorized to act on the insured's behalf, sign verifying premium financing documents, including a power of attorney or other document giving CII the right to cancel the policy.

In the three transactions in issue here, the insurance agent, Fries, signed documents purportedly on behalf of the insureds, without their prior knowledge or authorization. He then converted the proceeds to his own personal

purposes, and did not keep up the required monthly payments to CII. When CII sought to exercise its purported assigned right to cancel the insured's policies, it was discovered that the insureds had not sought any premium financing, and had not authorized Fries's actions or his signature on the relevant documents. In fact, the insureds had paid their own premiums directly; and their insurance policies were, therefore, fully paid for the term of the policy already. As a consequence, when CII sought to exercise what it believed was its assigned right to cancel the policies, the insurer, Fireman's Fund, refused to cancel the insureds' policies. Fries himself subsequently filed a bankruptcy petition, leaving a loss[1] to be absorbed either by the lender, CII, or the insurer, Fireman's Fund.

The matter was tried to the court. After accepting the stipulations of the parties and receiving additional testimony and documentary evidence, the trial court issued a statement of decision and entered judgment against the lender, CII, and in favor of Fireman's Fund. CII filed a timely appeal.

## II. Discussion

Here, an insurance agent purported to secure premium financing on behalf of insureds who did not need or request it, and who had not given him authority to sign financing documents on their behalf. The agent then converted the proceeds to his own purposes, leaving the lender and insurer to litigate the question of who should bear the resulting financial loss. We conclude the trial court correctly ruled that the lender, not the insurer, must bear the loss in the case of this unauthorized premium financing transaction.

There is no directly applicable California authority dealing with the legal question presented by this case. Further, the parties have not cited, and our own research has not disclosed, any directly applicable authority from other states.

We must begin with an examination of the terms of the relevant statute, California Insurance Code[2] section 673. Section 673 governs the procedures by which a lender in a premium financing transaction may acquire the right to cancel the insured's policy and secure the proceeds of the unearned premium as collateral for the transaction. Subdivision (b) of section 673 provides, "No lender shall exercise the right to cancel a financed insurance policy because of the default of the insured under a premium payment loan

---

[1] In the present case, this financial loss consisted of the amount of the premiums which were fraudulently financed by Fries, a total of at least $36,000.

[2] Unless otherwise indicated, all subsequent statutory references are to the Insurance Code.

agreement except in accordance with this section." The main statutory requirement which a lender must meet in this context is stated in subdivision (a) of section 673, which provides as follows: "As used in this section, 'exercise the right to cancel' means the act of formally electing to use the right of the insured to cancel any insurance policy in accordance with and subject to the provisions of that policy when the right to use that right of the insured has been transferred or assigned by the insured in writing *executed by, or on behalf of, the insured* to a lender who has advanced to the insurer the premium for the policy. The transfer or assignment may be by power of attorney or other document. The transfer or assignment may, but need not, be accompanied by an assignment of any unearned premium due the insured on cancellation."[3] (Italics added.) The crucial phrase to which we have given emphasis, which states that the transaction must be embodied in a writing "executed by, or on behalf of, the insured," was added by an amendment to section 673 in 1973 (1973 amendment). (Stats. 1973, ch. 849, § 1, p. 1515.)

The only California case which in any way applies this statutory language is a decision dealing with a very different factual situation by Division Three of this district, *Pacific Auto. Ins. Co.* v. *Wolff* (1977) 72 Cal.App.3d 537, 541 [140 Cal.Rptr. 164] (*Wolff*). The legal issues in *Wolff* did not, however, concern the situation we face here, where the insured did not in fact authorize a premium financing transaction, and did not authorize the agent to sign the premium financing documents "on behalf of" the insured under the terms of section 673. Rather, in *Wolff,* the agent had been orally authorized to obtain premium financing and sign the financing documents, but he apparently contended the oral authorization was ineffective, since under the equal dignities rule embodied in Civil Code section 2309, "an authority to enter into a contract required by law to be in writing can only be given by an instrument in writing."

Application of this general rule in light of the specific provision of section 673, added by the 1973 amendment, which allows the documents to be signed "on behalf of" the insured, was properly rejected by *Wolff.* (72 Cal.App.3d at p. 541.) The court applied this statutory language as follows: "Appellant's argument in this regard is premised primarily on the fact that the premium financing agreement was not personally signed by him, but was signed by an employee of his insurance agency. He asserts that his insurance agent was authorized only to obtain the insurance and financing, not to

---

[3]In addition, subdivision (i) of section 673 provides that once a lender makes a representation in writing that it has the right to cancel, accomplishes a cancellation, and receives an unearned premium, "such representation shall be conclusive as between the insurer and the lender." Obviously, no such cancellation was effected here.

cancel the policy. Appellant relies upon a series of cases holding that 'an agent authorized to procure insurance is not thereby made the agent of the insured to cancel a policy.' (*Hooker* v. *American Indemnity Co.* (1936) 12 Cal.App.2d 116. . . .) The holdings in *Hooker* and other cases cited by appellant are inapposite in that in those cases there was no authority given to the agent to cancel, whereas under the present circumstances, the authority is specifically granted by statute." (*Ibid.*)

The language of the 1973 amendment to section 673 was then relied upon by *Wolff* in order to uphold the validity of documents authorized by, but not personally signed by, the insured: "The principal thrust of appellant's argument is that since he did not personally sign the Agreement, it was ineffective to assign the right to cancel. However, section 673 does not require that the insured sign the Agreement. It may be executed on his behalf by another. Section 673, subdivision (a) was amended in 1973 to permit the written assignment or transfer of the right to cancel the policy to be '*executed by, or on behalf of, the insured.*' Prior thereto, the section had required the right to cancel be transferred '*by the insured in writing to a lender.*' The change in the section evidences a clear legislative intent to modify the prior requirement that the insured personally sign the document transferring the right." (72 Cal.App.3d at p. 541, italics in *Wolff.*)

*Wolff* correctly held that under the 1973 amendment to section 673, an insured could not escape from a premium financing agreement, which the insurance agent had been orally authorized to sign, merely because the insured did not give that agent written authorization to cancel the policy thus financed. *Wolff,* of course, does not hold the signature of the agent is effective even in cases, such as this one, where the insured never orally authorized the agent to secure premium financing and sign the necessary documents. Nor does section 673 as amended confer on an insurance agent the power to sign legally binding documents in the absence of any authorization by the insured; the document still must be signed "on behalf of" the insured; and numerous cases decided in analogous contexts by our Supreme Court, by this court (Division Five), and by other appellate courts hold that such a signature on behalf of another person would require authorization by the party who is purportedly being bound, in order to create a valid legal obligation. (See, e.g., *Blanton* v. *Womancare, Inc.* (1985) 38 Cal.3d 396, 407-408 [212 Cal.Rptr. 151, 696 P.2d 645, 48 A.L.R.4th 109] [An attorney's signature on behalf of a client on an arbitration agreement is binding on the client only if the client orally or in writing authorized the signature.]; *Taylor-Rush* v. *Multitech Corp.* (1990) 217 Cal.App.3d 103, 110 [265 Cal.Rptr. 672] (Opn. of Haning, J.) [When a receipt is signed on another

person's behalf, there must be separate evidence of authorization in order for the signature to be legally binding.]; *Superior Motels, Inc.* v. *Rinn Motor Hotels, Inc.* (1987) 195 Cal.App.3d 1032, 1048, fn. 9 [241 Cal.Rptr. 487] (Opn. of Poché, J.) [A notice of appeal signed on behalf of another is invalid unless the signature was authorized.]; *Lindsay-Field* v. *Friendly* (1995) 36 Cal.App.4th 1728, 1733-1736 [43 Cal.Rptr.2d 71] [An alleged agent's signature to a contract on behalf of others was not binding on principals who did not authorize the transaction.].)

This conclusion is fortified by our consideration of relevant portions of the legislative history of the 1973 amendment to section 673, which added the "on behalf of" language. There is no indication the Legislature intended by the 1973 amendment to allow insurance agents to make legally binding premium financing arrangements which were not authorized by the insured. Rather, the legislative summary of Assembly Bill No. 2522, which amended section 673, states, "This [amendment] would allow the insured to *authorize* someone else to execute the assignment of the right to cancel." (Italics added.) The major proponent of the legislation, the Liberty National Bank, also urged Governor Reagan to sign the legislation in order to abolish the equal dignities rule and allow banks and insurance premium finance companies to undertake these transactions "under oral authorization from the insured." In light of these statements, we are not impressed by CII's argument that the implicit intention of the 1973 amendment was that authorization by the insured was no longer necessary.[4]

Appellant lender CII, however, also places considerable emphasis on another ancient general rule of law, which CII describes as the doctrine of latent equities. CII cites the case of *Wright & Co.* v. *Levy* (1859) 12 Cal. 257 (*Levy*) for the proposition that where an assignee purchases an assignment for value in good faith, without knowledge of any latent defects, the assignee takes the claim free from equities of all others except the original obligor.

It is very difficult to understand how this legal principle aids CII's case. Here there was no original valid assignment of rights to CII; and, therefore, there is no question of latent equities following a valid assignment. This is made clear by a full reading of the very *Levy* case which CII cites. Our Supreme Court apparently at first wrongly decided the case, and affirmed a trial court ruling applying this correct principle of latent equities in favor of

---

[4]Moreover, obviously important questions of public policy would be raised by a rule which allowed the cancellation of the insured's insurance coverage without the insured's prior authorization. Those questions were clearly not addressed by the Legislature in the 1973 amendment to section 673.

a subsequent purchaser for value of a fraudulent assignment, because the court simply did not understand the facts of the case correctly. (*Levy, supra,* 12 Cal. at pp. 262-263.) On rehearing, our high court realized its error and reversed the judgment: "On rehearing: The opinion which we delivered in this case at the last term is correct in principle. We erred, however, in assuming that the assignment was of a judgment of Levy, and made by Newmark to Jones before the attachment of the plaintiff was put upon the property of the defendant." (*Id.* at p. 263.) The high court went on to reverse the judgment, because the purchaser of a fraudulent and, therefore, ineffective assignment is in no better position than the person from whom he derives his claim: "It is found by the Court that this note, attachment, etc., of Newmark's were fraudulent, but that the fraud was not known to Jones, who bought for value. The question then comes up whether Jones is protected in his purchase? We think, on this hypothesis of fact, he is not. . . . Jones has only the right Newmark had. Newmark . . . could not by any deed or act of his put his assignee in any better position." (*Ibid.*)

More critically, CII's postulated doctrine of latent equities must remain latent rather than patent here, because this case is governed by the specialized rules applicable to insurance premium financing stated in section 673. For the same reasons Division Three in *Wolff, supra,* 72 Cal.App.3d at page 541 rejected the attempt to engraft a general rule of law, the equal dignities rule, upon the contrary language of section 673, we must reject CII's attempt to vary the language of section 673 by engrafting onto it a different general rule concerning latent equities. Section 673 requires that a lender may not assert an assignment of the right to cancel an insurance policy, unless it has a written assignment signed either by the insured or "on behalf of" the insured. CII holds no such valid assignment under section 673.

We also cannot find any relevance in CII's citation of *Piedmont Premium Serv.* v. *S. C. Ins. Co.* (1981) 277 S.C. 99 [283 S.E.2d 828]. In that case, the South Carolina Supreme Court held that where the evidence supported a jury's factual finding that there was a valid insurance premium financing agreement, the insurer would be obligated to turn over the unearned premium to the lender. (*Id.* at p. 829.) The problem in our case, however, is that there was obviously no valid insurance premium financing agreement. No insured authorized Fries to engage in these transactions "on behalf of" the insured under section 673. (Cf. also *Alliance Acceptance* v. *Yale Ins. Agency* (1995) 271 Ill.App.3d 483 [208 Ill.Dec. 49, 648 N.E.2d 971, 974-975] [Where a premium finance company did not have a valid power of attorney, it could not collect unearned premiums from the insurers.].)

CII makes a number of other unavailing arguments, which do not merit extended discussion. First, CII contends the trial court erred as a matter of

law, because Fries received the funds he converted to his own purposes as premium payments; and under the terms of section 1733, he received those funds in a fiduciary capacity, on account for Fireman's Fund, and was guilty of theft. We agree generally with the legal principle that Fries received these funds on account for Fireman's Fund, and it is also obvious that Fries violated his fiduciary obligations to all parties in these transactions and was guilty of theft of the funds, but it is hard to see how these legal principles aid CII. CII's rights are governed by section 673, not section 1733. Fries did not receive the funds in question from the insureds as premium payments, as section 1733 contemplates; he received them from CII as proceeds from a fraudulent financing arrangement which was invalid under section 673. As a result of the invalidity of those transactions under section 673, CII could not exercise the rights it thought it had acquired to cancel the policies, as the trial court correctly ruled.

Next, CII contends Fries acted with "apparent authority" when he signed the documents on behalf of the insureds. This argument was never raised in the trial court, and may not be raised for the first time on appeal; we reject the contention on this basis. (See *Richmond* v. *Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874-880 [242 Cal.Rptr. 184].) In addition, we note that the court in *Hooker* v. *American Indemnity Co.* (1936) 12 Cal.App.2d 116, 121 [54 P.2d 1128] rejected a similar ostensible authority argument, and refused to allow the cancellation of the insured's coverage pursuant to a premium financing arrangement which was not, in fact, authorized by the insured. We also repeat that there is nothing in section 673 which allows an insurance agent such as Fries to enter into a legally binding premium financing arrangement "on behalf of" the insureds where the insureds, in fact, are unaware of the arrangement, did not authorize it, and made no representations themselves to CII which would reasonably cause it to believe the agent had authority to enter into it.

In a related argument, CII contends it should have prevailed against Fireman's Fund on an estoppel theory; but the trial court impliedly found, based upon ample substantial evidence, that Fireman's Fund had no knowledge of Fries's dereliction in engaging in unauthorized transactions until long after they occurred, and made no representations concerning these particular transactions to CII which could form the basis of estoppel. For the same reasons, Fireman's Fund could not be liable to CII on a failure to warn theory. Further, we find no legal duty on the part of an insurer which would reach beyond the scope of its relationship with its insured, and would extend to advising a third party regarding financial transactions. (See *Gibson* v. *Government Employees Ins. Co.* (1984) 162 Cal.App.3d 441, 448 [208

Cal.Rptr. 511]; *Ahern* v. *Dillenback* (1991) 1 Cal.App.4th 36, 42 [1 Cal.Rptr.2d 339]; *Industrial Indemnity Co.* v. *Touche Ross & Co.* (1993) 13 Cal.App.4th 1086, 1096-1097 [17 Cal.Rptr.2d 29].)[5]

### III.  DISPOSITION

The judgment is affirmed.

King, J., and Haning, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 14, 1996. Werdegar, J., was of the opinion that the petition should be granted.

---

[5]In addition, there is another argument made, not by CII, but in an amicus curiae brief filed by 11 insurance premium lenders. This argument was not raised in the trial court, and may not be raised for the first time on appeal. The amicus curiae brief attempts to argue that this case is somehow governed, not by section 673, but by section 3403, subdivision (a) of the Commercial Code. That section provides, in pertinent part, that "an unauthorized signature is ineffective except as the signature of the unauthorized signer in favor of a person who in good faith pays the instrument or takes it for value." We doubt this section applies here in any event, because the insurance premium financing documents in issue do not appear to be negotiable instruments governed by this section; but in any case, the quoted language in fact undermines the amicus curiae's position, by making clear that the unauthorized signature of Fries was ineffective except to transfer any rights held by Fries himself in the insureds' policies, which interests did not exist. Moreover, we repeat that these transactions are specifically governed by the specialized rules provided in section 673, not some other general rules of law. (See *Wolff, supra,* 72 Cal.App.3d at p. 541.)