[No. B140538. Second Dist., Div. One. Oct. 31, 2001.]

Conservatorship of the Person and Estate of JOEL M. LEVITT.
FRUMEH LABOW, as Conservator, etc., Petitioner, v.
MARC B. HANKIN, Claimant and Appellant.

[No. B142397. Second Dist., Div. One. Oct. 31, 2001.]

Conservatorship of the Person and Estate of PEGGY PAGE.
FRUMEH LABOW, as Conservator, etc., Petitioner, v.
MARC B. HANKIN, Claimant and Appellant;
KATHRYN STANLEY, as Executor, etc., Objector and Respondent.

## Counsel

Evan D. Marshall; Law Offices of Marc B. Hankin and Marc B. Hankin for Claimant and Appellant.

Law Offices of A. George Glasco and A. George Glasco for Objector and Respondent.

## Opinion

**MALLANO, J.**—Appellant Marc B. Hankin is a recognized leader in the field of elder law and the drafter of the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15600 et seq.). (1 Cal. Elder Law (Cont.Ed.Bar 1995) p. xiii.) He represented professional conservator Frumeh Labow in successful efforts to protect the modest estates of Joel M. Levitt and Peggy Page. In response to Hankin's request for attorney's fees in the two matters, the trial court praised Hankin's work but awarded approximately 15 percent less than he had requested in each case, citing among other things the size of the estates involved. Hankin appeals from the awards, arguing that fee reduction based on the size of an estate is bad policy and will dissuade attorneys from undertaking representation of middle-income elders who are being subjected to physical and financial abuse. We do not question the need to protect elders such as Levitt and Page nor the social value of Hankin's efforts. Nevertheless, Hankin's appellate issue must be assessed by the standard of abuse of discretion. We find no abuse. Accordingly, we affirm.

BACKGROUND

1. *Conservatorship of Levitt*

As of early 1997, Levitt was a 77-year-old legally blind widower with no children. He had a history of alcohol abuse and depression. His memory had begun to fail. Arrangements were made for Levitt to have a live-in caretaker. The caretaker, 46-year-old Barbara Gold, arrived on March 3, 1997. Almost immediately, Gold had Levitt sign checks that were made out to her. On April 11, 1997, Levitt and Gold were married in Las Vegas. Gold continued her efforts to control Levitt's assets. Levitt's niece became concerned. On April 25, 1997, Labow, a professional conservator being represented by Hankin, filed a petition for conservatorship of Levitt's person and estate.

Through counsel and in propria persona, Gold resisted the petition. Contentious litigation ensued, during which Labow also filed a petition to annul the marriage and a civil action for damages. Ultimately, Labow prevailed. By that time, Levitt had been permanently placed in a residential care facility.

Labow filed her first and final account and request for fees on October 7, 1999. Levitt's assets at that point, which included the estimated value of his home, were approximately $370,000. As part of the pleading, Hankin requested attorney's fees of $72,537.14 and $1,044.89 in expenses, to be paid by Levitt's estate. The request was based on 324 hours of services at $225 per hour for the majority of the work and at $250 per hour for more recent services, less a retainer that had been paid by Levitt's relatives. Labow requested $29,027 in fees. Attorney George Glasco, who had associated in with Hankin to conduct certain trial proceedings, requested $17,550. The Probate Volunteer Panel (PVP) attorney also filed a petition for fees, requesting $36,405.00 for 161.8 hours at $225 per hour.

Hankin, whose fee requests in previous elder abuse cases had been denied in part by the trial court, urged that his fees be paid in full irrespective of the size of the estate in order to encourage attorneys such as himself to take cases of financial elder abuse. As the hearing commenced, the court stated that while it appreciated the work done on the case, "I also have to consider the size of the estate here as far as making distributions. And the court has a problem in making any distribution that is over one-third of what the estate is. I have some problems where we deplete an estate in order to save the estate and it doesn't do much good." As the hearing continued, the court acknowledged that Levitt could remain in the residential care facility into which he had been placed for the remainder of his life because, if his assets

were exhausted, the payments would be taken over by Medi-Cal. The PVP attorney stated that Hankin's billing was appropriate, and if not for the intervention of the conservator, it is unlikely that Levitt would have lived very long under Gold's care.

In response, the court stated: "[T]here is a strong indication that [Gold] was in there for nothing but the money. There is no question that this was a difficult case. [¶] You [Hankin] are missing the point. . . . I am not upset about anybody's hours. I am not even upset about the pay rate other than the fact that I have to consider the size of the estate when I am looking at the pay rate. [¶] To say that no one would take [this type of case] . . . but I have got to tell you, I heard that for 10 years over in criminal where they said, if you want good attorneys to take death penalty cases, you have got to pay them the extraordinary rate on it, that's not true. There are people who will work for a little bit less and they will still do an outstanding job and not throw people out on the streets. [¶] I know that this is going to be uncomfortable for you and for everybody here, but I am going to cut the rates down on all this. And I am doing it not because I [don't think] the work justifies it. I think the time spent does justify it. I don't think the estate justifies it . . . ."

The trial court then ordered that Hankin be paid $64,000 for his services. Labow was awarded $27,000, Attorney Glasco was awarded $14,000, and the PVP attorney was awarded $32,000. The award to Hankin was set forth in an order filed February 3, 2000. Hankin filed a timely notice of appeal.

## 2. *Conservatorship of Page*

In 1997, Peggy Page was a widow in her early 80's. She had moderate cognitive impairment and was isolated from her family. Her neighbor, Charles Davis, had ingratiated himself with Page and had taken over her finances. A manager of Page's bank made out a report of suspected elder abuse when he observed that Davis had effectively taken control of Page's account. Kathryn Stanley, a niece of Page's late husband, contacted Adult Protective Services and was referred to conservator Labow and to Hankin.

The ensuing litigation was even more contentious than in *Levitt*. Again, Glasco ultimately associated in with Hankin. Davis's appointment as Page's temporary conservator was rescinded in favor of Labow. Davis was ultimately declared a vexatious litigant. Page died in December 1998. Shortly before Page's death, Labow filed an action against Davis and his attorney, among others, seeking to recover misappropriated assets.

Labow filed her first and final account and request for fees on November 18, 1999. The assets of Page's estate at that point were approximately

$130,000. Hankin requested $82,515 in fees and $6,628 in costs for 363 hours in services rendered, mostly at the rate of $250 per hour. Labow requested $14,094 in fees. The PVP attorney requested $7,962 in fees.

The superior court probate attorney's calendar notes state that Hankin's fee request appeared high based on the size of the estate, but that Hankin's and Labow's efforts preserved a portion of the estate and "Davis would have killed [Page] by depriving her of food and of medication that would have hastened her demise . . . ." At the hearing, the trial court ruled as follows:

"The Court: As far as the fees are concerned in establishing the reasonableness of the fees— [¶] . . . It seems like all the judges are disagreeing with you as far as fees are concerned. But I have got to set what I feel is reasonable and I am going to do that at this time. [¶] As far as the conservator's fees go, I am going to be setting that at $13,100. [¶] As far as the attorney's fees go, I am going to be setting that at $69,000. [¶] As far as attorney cost, I am going to be setting that at $6,628.26. [¶] PVP fees, I am setting at $7,962.50. [¶] Those fees are set after the court has reviewed the file, reviewed the services, and the court feels, taking everything in consideration of the file, the services rendered, the court thinks that is a reasonable value of the services that were rendered in the case.

"Mr. Hankin: Your Honor, can you explain why you reduced my fee?

"The Court: Counsel, it seems like we always go through this with you, and it seems like every judge is arguing with you and I am not going to get into an argument on this. [¶] I will tell you this that it is my job to look at the estate, the value of the services, what services were rendered, whether they were reasonable, the value of the services that were rendered and the value of the estate. [¶] My evaluations of those may be different from yours, may be different from a third person, may be different from a fourth person. But, I have got to make that determination. [¶] I have read everything that you have put in there. And I just think that the reasonable value of the services is what I stated on the record. It is not that I am disagreeing or cutting you down, it is what I find, what I think are the reasonable value of the services. They just happen to disagree with what you think."

The award to Hankin was set forth in an order filed May 24, 2000. Hankin filed a timely notice of appeal.[1]

## DISCUSSION

Prefatory to his legal argument, Hankin forcefully presents his policy position, noting that his intervention in the cases at bench protected the lives

---

[1] On March 27, 2001, we granted Hankin's motion to consolidate the Levitt and Page matters for purposes of oral argument and decision.

of the conservatees in addition to their financial assets, that the greed and persistence of adversaries such as Gold and Davis require a high degree of skill in conducting the litigation, and that compensation for attorney services in elder abuse cases is both unpredictable and delayed. Hankin also refers to information he has gathered to demonstrate that skilled lawyers would not risk taking an elder abuse case that did not involve a large estate. He further notes that the Los Angeles County Board of Supervisors has recognized the problem as well.[2]

■ Ultimately, Hankin contends that "the trial court abused its discretion by failing to consider all factors or to give a reasoned basis for the award, and by arbitrarily reducing Hankin's fee request." We cannot agree.

" 'It is well established that the determination of what constitutes reasonable attorney fees is committed to the discretion of the trial court . . . . [Citations.]' " (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096 [95 Cal.Rptr.2d 198, 997 P.2d 511].) In cases of elder abuse, an award of attorney's fees is to be based on "all factors relevant to the value of the services rendered . . . ." (Welf. & Inst. Code, § 15657.1.) A factor which must be specifically considered is "[t]he value of the abuse-related litigation in terms of the quality of life of the elder or dependent adult, and the results obtained." (*Id.*, § 15657.1, subd. (a).)

But the law is equally clear that the value of an estate is also an appropriate factor to consider in setting fees. Indeed, Welfare and Institutions Code section 15657.1 incorporates by reference the factors set forth in rule 4-200 of Rules of Professional Conduct of the State Bar of California, among which is "[t]he amount involved and the results obtained." (*Id.*, rule 4-200(B)(5).)

As stated in *PLCM Group, Inc. v. Drexler, supra,* 22 Cal.4th at page 1096, " 'The value of legal services performed in a case is a matter in which the trial court has its own expertise. [Citation.] . . . The trial court makes its determination after consideration of a number of factors, including the nature of the litigation, its difficulty, *the amount involved*, the skill required

---

[2]At Hankin's request, we have taken judicial notice of Los Angeles County Board of Supervisors' Order No. 14, adopted on September 12, 2000. The order states that "elderly persons with modest estates do not have ready access to legal advice and assistance, which would enable them to effectively redress the exploitation of their assets or obtain properly documented estate planning for their protection." It further advises, among other things, that "County Counsel, Public Guardian and Adult Protective Services work with the State and County Bar Associations on specific legislative proposals that would help improve access to the justice system for · elderly persons with modest incomes who have been victims of financial exploitation or need assistance on estate planning matters."

in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case.' [Citation.]" (Italics added.) Similarly, in *Estate of Trynin* (1989) 49 Cal.3d 868, 873-874 [264 Cal.Rptr. 93, 782 P.2d 232], the Supreme Court held that " '[e]very [probate] attorney should be fully and fairly paid for his [or her] services, having in mind their nature, their difficulty, *the value of the estate,* and the responsibility thus cast upon the counselor.' [Citation.]" (Italics added.) In *Estate of Beach* (1975) 15 Cal.3d 623, 645 [125 Cal.Rptr. 570, 542 P.2d 994], the Supreme Court noted the trial court "could properly consider not only the time spent but also such factors as *the value of the estate,* the skills exercised, the amount in dispute, and the results obtained. [Citations.]" (Italics added.)

Citing *Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 647 [71 Cal.Rptr.2d 632], Hankin argues that a fee award is erroneous when based on an incorrect application of legal standards. But unlike *Flannery,* the trial court's consideration of the size of the estates involved here was manifestly proper. Nor did the trial court fail to give a reasoned basis for its fee awards. Hankin misplaces reliance on *Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 626 [98 Cal.Rptr.2d 388], in which the trial court failed to explain a ruling that would have resulted in some of the plaintiffs' counsel being paid $800 per hour, an amount that the appellate court found to be reasonable only in a "truly pioneering and high risk case[]." No such lack of explanation exists here. Accordingly, we find no basis upon which to conclude that the trial court erred in setting the amount of Hankin's fee in these matters.

Although Hankin has not prevailed in these appeals, the brevity of our analysis should not be read as a lack of concern over the importance of the issue presented. Simply put, Hankin is in the wrong forum. Hankin fears that, to the extent the fees awarded below are the most that can be expected in cases involving abused elders with modest assets, qualified attorneys will be dissuaded from pursuing the noble cause of challenging elder abuse. But the law is clear that the trial court has broad discretion in setting fees, and it is therefore unlikely that Hankin will ever be able to demonstrate an abuse of that discretion in a situation similar to the ones here.

Unlike the courts, the Legislature has the capacity to conduct the kind of fact finding required to determine the degree to which fee awards throughout state may have undermined the representation of less-than-affluent elders. And it is only through the legislative process that the policy determinations derived from such fact finding may ultimately be implemented.

We expect that Hankin and other members of the elder abuse bar have coordinated efforts with offices of county counsel, public guardian, and adult

protective services to work on specific legislative proposals to improve access to the justice system for victims of elder abuse, as suggested in the order of the Los Angeles County Board of Supervisors that we have quoted above. (*Ante*, fn. 2.) We commend their efforts.[3]

### DISPOSITION

The orders under review are affirmed. The parties are to bear their own costs on appeal.

Ortega, Acting P. J., concurred.

**VOGEL (MIRIAM A.), J.**—I concur, but write separately to distance myself from the majority's suggestion that there is a need for legislative action in this area. (Maj. opn., *ante*, at pp. 550-551.)

As our opinion explains, the trial court has broad discretion to determine an appropriate fee in cases such as these, and is authorized to consider all relevant factors, including the time involved, the results obtained, and the size of the abused elder's estate. In the sound exercise of that discretion, the court can (as it did in these cases) consider the fact that a greater award of attorneys' fees, even where earned, would deplete the abused elder's estate to the detriment of the elder and, ultimately, to his heirs. I would not risk a diminution of that discretion, and would leave well enough alone.

A petition for a rehearing was denied November 29, 2001, and appellant's petition for review by the Supreme Court was denied January 29, 2002.

---

[3]In her respondent's brief in the Page matter, executor Kathryn Stanley argues issues that we cannot consider because she has not filed a cross-appeal. (*Kardly v. State Farm Mut. Auto. Ins. Co.* (1995) 31 Cal.App.4th 1746, 1748-1749, fn. 1 [37 Cal.Rptr.2d 612].) Other of her issues have been waived by failure to present them to the trial court. (See *California Indemnity Ins. Premium Finance Co. v. Fireman's Fund Ins. Co.* (1995) 40 Cal.App.4th 1633, 1641 [47 Cal.Rptr.2d 743]; *Santantonio v. Westinghouse Broadcasting Co.* (1994) 25 Cal.App.4th 102, 113 [30 Cal.Rptr.2d 486].) We further find no support for Stanley's request that this court issue findings of fact pursuant to California Rules of Court, rule 23, or her request for sanctions.