Filed 10/27/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| UFCW & EMPLOYERS BENEFIT TRUST,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>SUTTER HEALTH et al.,<br><br>        Defendants and Appellants. | A143399<br><br>(San Francisco City and County<br>Super. Ct. No. CGC-14-538451) |

Respondent UFCW & Employers Benefit Trust (UEBT) is a healthcare employee benefits trust governed by the Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. § 1001 et seq.). (*Id*., § 1144(b)(2).) UEBT pays healthcare providers directly from its own funds for the services provided to enrollees in its health plans. As a self-funded payor, UEBT contracted with a "network vendor," California Physicians' Service (doing business as Blue Shield of California; hereafter Blue Shield),[1] to obtain access to Blue Shield's provider network at the rates Blue Shield had separately negotiated, as well as certain administrative services. One of Blue Shield's preexisting

---

[1] Blue Shield is a health care service plan licensed under the Knox-Keene Health Care Service Plan Act of 1975 (Knox-Keene Act) (Health & Saf. Code, § 1340 et seq.; all further undesignated statutory references are to the Health & Saf. Code). " 'The Knox-Keene Act is a comprehensive system of licensing and regulation under the jurisdiction of the Department of Managed Health Care.' " (*Prospect Medical Group, Inc. v. Northridge Emergency Medical Group* (2009) 45 Cal.4th 497, 504.) As a health care service plan, Blue Shield negotiates contracts with providers to obtain reduced rates for the providers' services that Blue Shield offers its own members. However, in its capacity as a "network vendor," and as permitted by the terms of its contracts with providers, Blue Shield also allows other entities to access its "provider network" for a fee.

1

provider contracts was with Sutter Health (Sutter)—a group of health care providers in Northern California.

In this action, UEBT sues Sutter, on behalf of a putative class of all California self-funded payors, alleging that Sutter's various written and oral contracts with network vendors—such as Blue Shield—contain anticompetitive terms that insulate Sutter from competition and drive up the cost of healthcare. UEBT seeks, inter alia, damages, restitution, and injunctive relief under the Cartwright Act (Bus. & Prof. Code, § 16720 et seq.) and California's unfair competition law (UCL) (*id.*, § 17200). Sutter moved to compel arbitration of UEBT's complaint, relying on an arbitration clause in the provider contract signed by Sutter and Blue Shield. The trial court denied Sutter's motion, concluding that UEBT was not bound to arbitrate its claims pursuant to an agreement it had not signed or even seen. Sutter appeals and we affirm.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

This case centers on two contracts—one between Sutter and Blue Shield (the Provider Contract) and an "administrative services only" agreement between Blue Shield and UEBT (the ASO Contract).

*The Terms of the Contracts*

In 2007, Sutter and Blue Shield signed a "Systemwide Amendment" that, among other things, (1) provides reduced service rates to Blue Shield and third parties that contract with Blue Shield to pay those rates and (2) contains an arbitration clause.[2]

With respect to third-party payors, the Provider Contract provides that Blue Shield's "provider network, which includes all the [Sutter] Providers, may be sold, leased, transferred or conveyed," and that Blue Shield "shall comply with all requirements of . . . Section 1395.6."[3] Accordingly, the Provider Contract provides that

---

[2] We refer to this systemwide amendment and its various subsequent amendments as the Provider Contract.

[3] Section 1395.6, subdivision (a), provides: "In order to prevent the improper selling, leasing, or transferring of a health care provider's contract, it is the intent of the Legislature that every arrangement that results in a payor paying a health care provider a

2

only third-party payors "that both (i) Actively Encourage their Members to use [Blue Shield]'s provider network and (ii) use [Blue Shield]'s provider network as their exclusive network in areas where [Blue Shield] is the contracted network for the specific Benefit Program shall be permitted to access the discounted rates set forth in this Agreement." The Provider Contract also requires Blue Shield to disclose to Sutter the third-party payors "currently eligible to access the Providers . . . ."

In 2007, the Provider Contract required "[Blue Shield] [to] assure that Other Payers have agreed to be bound by . . . the Dispute Resolution and Binding Arbitration Process outlined in Exhibit 13." The Provider Contract also contained a confidentiality provision that defined the agreement itself as "Confidential Information," to be maintained "in strictest confidence." Sutter prohibited Blue Shield from disclosing the terms of the Provider Contract without prior written authorization.

In 2009, Blue Shield and UEBT entered into the ASO Contract. Thereunder, UEBT pays Blue Shield a fee for administrative services, including processing the healthcare providers' claims for payment, as well as for access to Blue Shield's provider network at the rates negotiated by Blue Shield. UEBT reimburses Blue Shield for all covered health care charges paid on behalf of UEBT members. In the ASO Contract, UEBT and Blue Shield expressly disclaimed an agency relationship and expressly agreed to litigate unresolved disputes in California courts.

As a result of the ASO Contract, UEBT became an "ASO Payer" under the Provider Contract. UEBT and Blue Shield acknowledged, "in making its network of

reduced rate for health care services based on the health care provider's participation in a network or panel shall be disclosed to the provider in advance and that the payor shall actively encourage beneficiaries to use the network, unless the health care provider agrees to provide discounts without that active encouragement." Subdivision (b) of the same section requires certain disclosures from "every contracting agent that sells, leases, assigns, transfers, or conveys its list of contracted health care providers and their contracted reimbursement rates to a payor . . . ." Business and Professions Code, section 511.1 contains similar language. Subdivision (b)(6) of Business and Professions Code, section 511.1, and Health and Saftey Code section 1395.6, specifically provides: "Nothing in this subdivision shall be construed to impose requirements or regulations upon payors . . . ."

3

Contracted Providers available to [UEBT], *Blue Shield is subject to* California Business and Professions Code [section] 511.1 et seq." (Italics added & omitted.) Accordingly, UEBT agreed "to actively encourage the use of the Contracted Providers"—an obligation it has fulfilled. However, section 9.3 of the ASO Contract provides: "Benefit payments made by [UEBT] to Contracted Providers shall be in accordance with the payment provisions in the contracts between Blue Shield and Contracted providers to the extent such payment terms are communicated to Client. Nothing in this Agreement is intended to create any third party beneficiary rights in any persons or entities, including, but not limited to, Contracting Providers. *This Agreement does not create any contractual relationship between* [*UEBT*] *and Contracted Providers, nor shall anything in this Agreement be construed as a sale, lease or transfer to* [*UEBT*] *of any agreement or contract between Blue Shield and any Contracting Provider*." (Italics added.)

Pursuant to the ASO Contract, Blue Shield notified Sutter that UEBT enrollees would be accessing the Blue Shield network of providers. UEBT's beneficiaries began presenting Blue Shield cards to Sutter to obtain medical services at the agreed rates. The existence of the Provider Contract's arbitration clause was not disclosed to UEBT.

In 2012, Sutter and Blue Shield amended the Provider Contract, amending the "Dispute Resolution" provision so that it expressly applied to "[a]ll disputes" between "Sutter and any . . . ASO Payer." Blue Shield was also now contractually required to ensure "that all . . . ASO Payers . . . have agreed to be bound by the terms of this Agreement, including without limitation the Dispute Resolution and Binding Arbitration Process set forth in Exhibit 13." However, Sutter and Blue Shield did not amend Exhibit 13, which continued to provide: "Overall Scope. The provisions for mediation and binding arbitration set forth in this Exhibit *shall apply to all disputes between the Parties* arising from or in any way related to the Provider Contracts and/or this Amendment . . . . [¶] . . . [¶] . . . Agreement to Arbitrate. If they cannot resolve their disputes through the meet and confer process or mediation (if applicable), *the Parties* shall submit the dispute(s) to binding arbitration in lieu of any form of litigation in any court." The "Parties" are defined in the preamble as Sutter and Blue Shield.

4

In 2012, Sutter and Blue Shield also amended the confidentiality provisions of the Provider Contract.  Rather than requiring Sutter's prior written authorization for each disclosure, as had previously been required, Sutter and Blue Shield agreed that Blue Shield may disclose the Provider Contract to "a Payer . . . as necessary for Payer . . . to comply with its obligations under this Agreement," so long as the payor agreed to maintain the contract's confidentiality.  However, when UEBT requested copies of Blue Shield's contracts with Sutter in 2013, the request was declined by Blue Shield on the ground the contracts were "proprietary."

*UEBT's Lawsuit Against Sutter*

In April 2014, UEBT sued Sutter, on behalf of itself and a class of all other California self-funded payors who have paid Sutter, claiming that the terms of the "written or oral contracts" Sutter enters with network vendors violate the Cartwright Act and the UCL, causing the class members to overpay for Sutter's services.  Specifically, UEBT alleges on information and belief,[4] that Sutter demands inclusion of anticompetitive terms, including prohibiting disclosure of hospital pricing information, prohibiting efforts to encourage patients to select the most cost-effective providers, and requiring network vendors to include all of Sutter's hospitals and facilities in their networks.  Through this alleged anticompetitive conduct, in combination with "punitively high [o]ut-[o]f-[n]etwork [h]ospital [c]hargemaster pricing," Sutter forecloses price competition, allowing it to charge inflated prices that substantially exceed the prices charged by other local hospitals.  UEBT alleges the cost of hospital healthcare in Northern California exceeds the cost of care in more competitive markets, like Southern California, by an average of 38 percent as a result.  UEBT seeks, inter alia, damages, restitution, and declaratory and injunctive relief prohibiting Sutter's anticompetitive conduct.

---

[4] UEBT's complaint alleges that the contractual restraints of trade have not been disclosed to UEBT or any other self-funded payor.

5

*Motion to Compel Arbitration*

Sutter moved to compel arbitration of UEBT's complaint. Sutter argued, inter alia, that UEBT was bound by section 1375.7 to the terms of the 2012 amendment to the Provider Contract.[5] Following briefing, limited discovery, and two hearings, the trial court denied Sutter's motion.

In its statement of decision, the trial court observed, "under the 2012 Amendments, Sutter and Blue Shield agreed that the arbitration provision applied to ASO Payers in addition to the contracting 'Parties.' " The court concluded UEBT was not bound because "UEBT is not a signatory to the [Provider Contract]," UEBT could not be compelled to arbitrate under common law principles, and section 1375.7, subdivision (d), does not apply. The court specifically stated: "There is no evidence that UEBT knew of Blue Shield's promise [to bind ASO Payers], nor any evidence that Blue Shield fulfilled that contractual obligation by obtaining an express agreement from UEBT to be bound by the Sutter arbitration clause. . . . [¶] . . . UEBT has never seen the [Provider Contract,] the 2012 amendments occurred after UEBT contracted with Blue Shield, and, in fact, Sutter prohibited Blue Shield from revealing the [Provider Contract] to anyone else." Finally, the trial court determined that, even if UEBT was bound by the Provider Contract, the arbitration clause therein does not apply to the antitrust and UCL claims in UEBT's complaint. Sutter filed a timely notice of appeal.[6]

## II.    DISCUSSION

It is undisputed that UEBT did not sign the Provider Contract, which contains an arbitration agreement. UEBT only signed the ASO Contract, in which it expressly agreed to litigate unresolved disputes in California courts. The question, on appeal, is whether

---

[5] "When a contracting agent sells, leases, or transfers a health provider's contract to a payor, the rights and obligations of the provider shall be governed by the underlying contract between the health care provider and the contracting agent." (§ 1375.7, subd. (d)(1).)

[6] An order denying a petition to compel arbitration is an appealable order. (Code Civ. Proc., § 1294, subd. (a).)

Sutter can nonetheless compel UEBT to arbitrate its antitrust and UCL claims. Sutter contends the trial court erred in denying its motion to compel because: (1) Section 1375.7, subdivision (d), binds UEBT to the terms of the Provider Contract; (2) UEBT is equitably estopped to avoid arbitration; (3) Blue Shield served as UEBT's agent and agreed to arbitration on UEBT's behalf; and (4) UEBT's antitrust and UCL claims fall within the scope of disputes required to be arbitrated under the Provider Contract.[7] Finding no merit in Sutter's first three arguments, we need not reach the final issue.

A. *Arbitration Overview*

Both the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and the California Arbitration Act (Code Civ. Proc., § 1280 et seq.) favor enforcement of valid arbitration agreements.[8] (*Moses H. Cone Hospital v. Mercury Constr. Corp.* (1983) 460 U.S. 1, 24–25 ["the [Federal] Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"]; *Wagner Construction Co. v. Pacific Mechanical Corp.* (2007) 41 Cal.4th 19, 25–26 [strong public policy in favor of arbitration].) "The fundamental policy underlying both acts 'is to ensure that arbitration agreements will be enforced in accordance with their terms.' " (*Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 59, italics omitted.)

---

[7] Blue Shield and the California Hospital Association each filed an amicus curiae brief. Both contend that UEBT was bound to the terms of the Provider Contract by section 1375.7, subdivision (d). However, Blue Shield also argues that UEBT's antitrust and UCL claims are nonetheless outside the scope of the arbitration agreement.

[8] In its amicus brief, Blue Shield insists the Federal Arbitration Act applies. (9 U.S.C. § 2 ["A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"].) We need not resolve the issue, because "[e]ven if the [Federal Arbitration Act] applies, the question whether a contract containing an arbitration provision can be enforced by or against nonparties to the contract is governed by state law principles." (*DMS Services, LLC v. Superior Court* (2012) 205 Cal.App.4th 1346, 1353, fn. 3 (*DMS Services*).)

"Arbitration is therefore a matter of contract. [Citation.] The ' " ' " ' . . . policy favoring arbitration cannot displace the necessity for a voluntary agreement to arbitrate.' " [Citation.] "Although '[t]he law favors contracts for arbitration of disputes between parties' [citation], ' "there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate . . . ." ' [Citations.]" ' [Citation.] 'Absent a clear agreement to submit disputes to arbitration, courts will not infer that the right to a jury trial has been waived.' " ' " (*Avery v. Integrated Healthcare Holdings, Inc., supra,* 218 Cal.App.4th at p. 59, italics omitted.)

In other words, "[t]he strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement, and a party cannot be compelled to arbitrate a dispute that he has not agreed to resolve by arbitration." (*Benasra v. Marciano* (2001) 92 Cal.App.4th 987, 990; accord, *Matthau v. Superior Court* (2007) 151 Cal.App.4th 593, 598.) "The party seeking arbitration bears the burden of proving the existence of an arbitration agreement . . . ." (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development* (*U.S.*)*, LLC* (2012) 55 Cal.4th 223, 236 (*Pinnacle Museum*).)

Nonetheless, there are doctrines under which nonsignatories to an arbitration agreement can be compelled to arbitrate, including incorporation by reference, assumption, agency, veil-piercing or alter ego, estoppel, and third-party beneficiary. (*Suh v. Superior Court* (2010) 181 Cal.App.4th 1504, 1513.) "Whether or not an arbitration agreement is operative against a person who has not signed it involves a question of 'substantive arbitrability' which is to be determined by the court." (*Boys Club of San Fernando Valley, Inc. v. Fidelity & Deposit Co.* (1992) 6 Cal.App.4th 1266, 1271.) Whether an arbitration agreement is operative against a nonsignatory is a question of law reviewed de novo.[9] (*Suh*, at p. 1512.)

---

[9] Sutter and UEBT disagree on the applicable standard of review. Here, Sutter challenges the trial court's conclusions on questions of law, not its factual findings. Accordingly, the substantial evidence standard does not apply. For the same reason, we deny UEBT's request for judicial notice of Sutter's amended demand for arbitration

8

B.    *Section 1375.7*

Sutter acknowledges the trial court found that UEBT had never seen the Provider Contract, but argues that finding is irrelevant.  Instead, Sutter's primary argument is that UEBT is bound to arbitrate its complaint by virtue of section 1375.7, subdivision (d), notwithstanding Blue Shield's and UEBT's attempt to disclaim the applicability of the Knox-Keene Act.  (See § 1375.7, subd. (e) ["[a]ny contract provision that violates subdivision (b), (c), or (d) shall be void, unlawful, and unenforceable"].)  According to Sutter, "[b]ecause UEBT . . . was bound by statute to the Provider Contract's terms, it was up to UEBT to inform itself about those terms if it wished to avail itself of the reduced rates provided by that contract."

The proper interpretation of section 1375.7, subdivision (d), is a question of first impression.  Section 1375.7, subdivision (d), provides:  "When a contracting agent *sells, leases, or transfers* a health provider's contract to a payor, the rights and obligations *of the provider* shall be governed by the underlying contract between the health care provider and the contracting agent."[10]  (§ 1375.7, subd. (d)(1), italics added.)  " 'Health

against Blue Shield.  UEBT maintains that Sutter's representations in its amended arbitration demand establish conclusively that UEBT had no actual knowledge of the arbitration clause.  Sutter opposes the request.  First, we do not view Sutter's appeal as a challenge to the trial court's finding on actual knowledge.  Furthermore, it may not be reasonably subject to dispute that the amended demand was submitted (Evid. Code, § 452, subd. (h)), but the truth of matters asserted in such a demand is not subject to judicial notice.  (*Wolf v. CDS Devco* (2010) 185 Cal.App.4th 903, 915 [judicial notice proper only as to existence of the pleading, not as to truth of any allegations contained therein]; *Ross v. Creel Printing & Publishing Co.* (2002) 100 Cal.App.4th 736, 743 [same].)  The existence of the amended demand is irrelevant and we deny the request for judicial notice.  (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1135, fn. 1 [material to be judicially noticed must be relevant].)

    [10] In addition to the Health and Safety Code, the same language was enacted in three additional codes.  (See Bus. & Prof. Code, § 511.3, subd. (a) ["[w]hen a contracting agent sells, leases, or transfers a health provider's contract to a payor, the rights and obligations of the provider shall be governed by the underlying contract between the health care provider and the contracting agent"]; Ins. Code, § 10178.4, subd. (a) [same]; Lab. Code, § 4611, subd. (a) [same].)  Likewise, none of these parallel provisions have been judicially construed.

9

care provider' means any professional person, medical group, independent practice association, organization, health care facility, or other person or institution licensed or authorized by the state to deliver or furnish health services." (§ 1375.7, subd. (h)(1).) " 'Contracting agent' means a health care service plan, including a specialized health care service plan, while engaged, for monetary or other consideration, in the act of selling, leasing, transferring, assigning, or conveying, a provider or provider panel to payors to provide health care services to beneficiaries." (§ 1395.6, subd. (d)(2); see § 1375.7, subd. (d)(2)(A).) " '[P]ayor' means a health care service plan, including a specialized health care service plan, an insurer licensed under the Insurance Code to provide disability insurance that covers hospital, medical, or surgical benefits, automobile insurance, workers' compensation insurance, or a self-insured employer that is responsible to pay for health care services provided to beneficiaries." (§ 1395.6, subd. (d)(3)(A); see § 1375.7, subd. (d)(2)(B).)

Despite the trial court's brief suggestion to the contrary, there is no legitimate dispute that Blue Shield is a "contracting agent," that Sutter is a "health care provider," or that UEBT is a "payor." Instead, as the parties frame the issue, we must determine the meaning of the undefined terms "sells, leases, or transfers." Sutter contends that the statutory terms must be given a broad interpretation—to describe the situation, as presented here, when a network vendor accepts a fee from a payor in exchange for the payor's access to the provider network at reduced rates. "[O]therwise, UEBT could pay Sutter the same reduced rates that Blue Shield pays but without providing the consideration Sutter bargained for in exchange for those rates. . . . As the statute recognizes, it would be manifestly unfair if UEBT could retain the benefits of the contract without providing the consideration Sutter required in exchange." UEBT, on the other hand, argues that the Legislature intended section 1375.7 to apply only to assignments of provider contracts. According to UEBT, section 1375.7 is not triggered when a healthcare services plan merely provides a payor with "access" to its provider network—as Blue Shield did here.

10

"In construing statutes . . . our task is to ascertain and give effect to the legislative intent. (*People v. Murphy* (2001) 25 Cal.4th 136, 142.) 'We begin by examining the words of the statute, giving them their usual and ordinary meaning and construing them in the context of the statute as a whole. [Citations.] If the plain language of the statute is unambiguous and does not involve an absurdity, the plain meaning governs.' " (*Eel River Disposal & Resource Recovery, Inc. v. County of Humboldt* (2013) 221 Cal.App.4th 209, 225 (*Eel River*).) "Ambiguity exists when a statute is capable of being understood by reasonably well-informed persons in two or more different senses." (*Ibid.*)

"Where . . . the statutory language is susceptible of more than one reasonable interpretation, ' " ' "we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' " ' (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 715 . . . .) Our responsibility is to ' "select the construction that comports most closely with the apparent intent of the Legislature, with a view toward promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' (*People v. Coronado* (1995) 12 Cal.4th 145, 151.) 'In addition, we are required to harmonize statutes by considering a particular clause or section in "the context of the . . . statutory scheme of which it is a part." [Citation.]' (*Ordlock v. Franchise Tax Bd.* (2006) 38 Cal.4th 897, 909.)" (*Eel River, supra,* 221 Cal.App.4th at p. 227.) Another extrinsic aid is the technical meaning of a term in the relevant industry. (*Id.* at p. 233.)

The trial court found the statutory interpretation issue to be "very close." The court noted, "The parties' briefing is insufficient to determine the issues, although given the variation in Legislative definition noted [in sections 1375.7 and 1395.6] UEBT is probably right" that UEBT had merely "accessed" the network and that "accessing" the network is something different from obtaining the right to use the network at reduced rates by sale, lease, or transfer.

Sutter maintains the trial court relied on a distinction without a difference. According to Sutter, "[t]he right to access is the result of the transaction between Blue Shield and UEBT, and a sale, lease, or transfer is how that result came about." (Boldface & italics omitted.) Sutter contends that similar terms have already been judicially construed and that a sale, lease, or transfer can be accomplished without assignment. It relies on *Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474, *Korean Air Lines Co., Ltd. v. County of Los Angeles* (2008) 162 Cal.App.4th 552, and *Gomon v. TRW, Inc.* (1994) 28 Cal.App.4th 1161. But none of these decisions involve statutory construction of what it means to "sell[], lease[], or transfer[]" a contract, much less in the instant context.

Nor does section 1395.6 clarify the matter, as Sutter suggests. The language that currently appears in section 1375.7, subdivision (d), was originally enacted in 2003. (Stats. 2003, ch. 203, § 2, p. 1808 [Assem. Bill No. 175].) Section 1395.6, on the other hand, was enacted in 1999. (Stats. 1999, ch. 545, § 2, p. 3772.) Section 1395.6 addresses the "silent PPO [(preferred provider organization)] scheme," which involves a payor who has an agreement with a network vendor and claims the discounted PPO rate for services but without providing any incentives to channel clients to that provider. (*Walsh Chiropractic, LTD v. Stratacare, Inc.* (S.D.Ill. 2010) 752 F.Supp.2d 896, 903; Sen. Com. on Insurance, Analysis of Assem. Bill No. 175 (2003–2004 Reg. Sess.) as amended Apr. 28, 2003, p. 2.) Nonetheless, "[i]t is a general rule of statutory construction to construe words or phrases in one statute in the same sense as they are used in a closely related statute pertaining to the same subject." (*California Society of Anesthesiologists v. Brown* (2012) 204 Cal.App.4th 390, 403.)

Confounding the problem is the fact that the Legislature employed different terms in section 1395.6 and in section 1375.7, subdivision (d). Section 1395.6, subdivision (a), provides: "In order to prevent the improper *selling, leasing, or transferring* of a health care provider's contract, it is the intent of the Legislature that *every arrangement that results* in a payor paying a health care provider a reduced rate for health care services based on the health care provider's participation in a network or panel shall be disclosed

12

to the provider in advance and that the payor shall actively encourage beneficiaries to use the network, unless the health care provider agrees to provide discounts without that active encouragement." (Italics added.) Based on the italicized language above, Sutter contends that "selling, leasing, or transferring" a health provider's contract means "[any] arrangement that results in a payor paying a health care provider a reduced rate." Sutter suggests it is impossible to construe "selling, leasing, or transferring" narrowly without defeating the Legislative intent to reach "every arrangement that results in a payor paying a health care provider a reduced rate." (§ 1395.6, subd. (a).) We disagree.

Section 1395.6, subdivision (b), implements that intent by providing, "Beginning July 1, 2000, every contracting agent that *sells, leases, assigns, transfers, or conveys* its list of contracted health care providers and their contracted reimbursement rates to a payor . . . or another contracting agent shall, upon entering or renewing a provider contract, do all of the following: [¶] (1) Disclose to the provider whether the list of contracted providers may be sold, leased, transferred, or conveyed to other payors or other contracting agents, and specify whether those payors or contracting agents include workers' compensation insurers or automobile insurers. [¶] (2) Disclose what specific practices, if any, payors utilize to actively encourage a payor's beneficiaries to use the list of contracted providers when obtaining medical care that entitles a payor to claim a contracted rate. . . . [¶] . . . [¶] (3) Disclose whether payors to which the list of contracted providers may be sold, leased, transferred, or conveyed may be permitted to pay a provider's contracted rate without actively encouraging the payors' beneficiaries to use the list of contracted providers when obtaining medical care. . . . [¶] (4) Disclose, upon the initial signing of a contract, and within 30 calendar days of receipt of a written request from a provider or provider panel, a payor summary of all payors currently eligible to claim a provider's contracted rate due to the provider's and payor's respective written agreement with any contracting agent. [¶] (5) Allow providers, upon the initial signing, renewal, or amendment of a provider contract, to decline to be included in any list of contracted providers that is sold, leased, transferred, or conveyed to payors that do not actively encourage the payors' beneficiaries to use the list of contracted providers

13

when obtaining medical care as described in paragraph (2). . . . [¶] (6) Nothing in this subdivision shall be construed to impose requirements or regulations upon payors . . . ." (§ 1395.6, subd. (b), italics added.)

In our view, section 1395.6 provides little assistance. On the one hand, it suggests to us that the Legislature knew how to express its intent that "*every arrangement that results* in a payor paying a health care provider a reduced rate" be subject to regulation. (§ 1395.6, subd. (a), italics added; see § 1395.6, subd. (d)(3)(B) ["[f]or the purposes of subdivision (c), 'payor' means only a health care service plan, including a specialized health care service plan that has purchased, leased, *or otherwise obtained the use* of a provider or provider panel to provide health care services to beneficiaries pursuant to a contract that authorizes payment at discounted rates" (italics added)].) Yet it did not use similar "every arrangement" language in section 1375.7, subdivision (d). " 'It is a well recognized principle of statutory construction that when the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded.' " (*Suman v. BMW of North America, Inc.* (1994) 23 Cal.App.4th 1, 10–11; accord, *In re Jennings* (2004) 34 Cal.4th 254, 273.) On the other hand, section 1395.6, subdivision (b), specifically includes "assigns," in addition to "sells, leases, . . . transfers, or conveys"—suggesting these latter terms do not mean "assigns." We agree with Sutter that, "[i]f the Legislature had intended to limit [section 1375.7, subdivision (d),] only to assignments, it would have been a simple matter to do so: It could have simply used the word 'assigns,' " as it did in section 1395.6, subdivision (b). We are left with ambiguity that even the legislative history does not resolve.[11]

However, even if we assume Sutter's interpretation of "sells, leases, or transfers" is correct, we would still conclude that section 1375.7, subdivision (d), has no application

---

[11] We grant both Sutter's and UEBT's requests for judicial notice of the legislative history of Assembly Bill No. 175 (2003–2004 Reg. Sess.). (Evid. Code, § 452, subd. (c).) In the absence of any evidence that the letters and other materials to which UEBT objects were considered by the Legislature as a whole, we rely primarily on the published legislative history materials and not on any such letters and other materials. UEBT's motion to strike Sutter's reply on this issue is denied.

because there is a more fundamental problem with its statutory construction. Sutter and the California Hospital Association argue that section 1375.7, subdivision (d), means that "when such a 'sale, lease, or transfer' of a provider's contract occurs, the *payor is bound* by all the terms in . . . the [Provider Contract]." (Italics added.) However, that is not what section 1375.7, subdivision (d), provides. We agree with the trial court that section 1375.7, subdivision (d), does not regulate the payor. Rather, section 1375.7, subdivision (d), merely protects health care providers from being forced to abide by contract provisions to which they did not agree.

Section 1375.7, subdivision (d), speaks only of the "rights and obligations *of the provider*" and mandates that those rights and obligations are governed by the contract signed by the provider. (Italics added.) In arguing that the rights and obligations of a nonsignator third party payor are also governed by the provider contract, Sutter and the California Hospital Association seek to turn section 1375.7 on its head. Assembly Bill No. 175 (2003–2004 Reg. Sess.) was intended "to prevent the improper use of a health provider's contract when a plan or contracting agent sells, leases or transfers the right to use the plan's network of health care providers to a third party entity for use in obtaining discounted rates. Currently, when these arrangements are made, *the third party may try to impose different terms on the provider* than what are in the underlying original contract between the provider and the plan or contracting agent. This bill simply states that *when the provider's contract is used* by a third party, *the terms of the contract the provider actually agreed to will govern* regardless of the terms of the contract between the plan or contracting agent and the third party." (Sen. Com. on Insurance, Analysis of Assem. Bill No. 175 (2003–2004 Reg. Sess.) as amended Apr. 28, 2003, p. 2, italics added.) But it was also intended that "the *plan* [*or contracting agent*] *will be required to make the relevant contract terms of both contracts consistent with each other*," so as to be "consistent with basic contract law and fairness." (Sen. Com. on Insurance, Analysis of Assem. Bill No. 175 (2003–2004 Reg. Sess.) as amended Apr. 28, 2003, p. 3, italics added.) The Legislature clearly intended that the "contracting agent" would have the responsibility for making the two contracts consistent in their relevant terms. This

15

history contradicts Sutter's and the California Hospital Association's assertion that the Legislature intended to simply bind the third party to undisclosed terms, with no action required of the contracting agent. The trial court aptly pointed out the irony of Sutter's argument that a statute designed to bar the imposition of terms on unwitting providers should actually impose an undisclosed arbitration term on another unwitting party— UEBT. Without a clear indication that the Legislature intended such an ironic result, we decline " 'to insert what has been omitted.' " (*Williams v. Superior Court* (1993) 5 Cal.4th 337, 357; Code Civ. Proc., § 1858.)

The California Hospital Association may be right that, in advocating in support of Assembly Bill No. 175, "[t]he problem [it] and others in the provider community sought to address . . . is that third parties were trying to take just the parts of the managed-care contracts that permit discounts, without taking the other obligations that flow with those contracts." Our task is to determine the intent of the *Legislature*. And there are several indications in the legislative history that Assembly Bill No. 175 was intended to simply clarify existing contract law—that a provider could not be forced to accept rates for services to which it had never agreed. (Sen. Com. on Insurance, Analysis of Assem. Bill No. 175 (2003–2004 Reg. Sess.) as amended Apr. 28, 2003, p. 3 ["[t]he author asserts that it isn't fair for providers to have to absorb the differences they are paid based on discrepancies between their contracts, plans and third party payors"]; Cal. Dept. Finance, Bill Analysis of Assem. Bill No. 175 (2003–2004 Reg. Sess.) as amended Apr. 28, 2003; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 175 (2003–2004 Reg. Sess.) as amended Apr. 28, 2003, p. 3; Cal. Business, Transportation & Housing Agency, Enrolled Bill Rep. on Assem. Bill No. 175 (2003–2004 Reg. Sess.), p. 2 ["[t]his bill reiterates existing contract law by clarifying that when a health plan sells or leases its provider network, the rights and obligations of the provider's contract with the original health plan . . . will govern"].)[12]

---

[12] Contrary to Sutter's assertion, " '[w]e have routinely found enrolled bill reports, prepared by a responsible agency contemporaneous with passage and before signing, instructive on matters of legislative intent.' " (*Turner v. Association of American*

As amended by the Assembly on April 21, 2003, Assembly Bill No. 175 would have added the following language to section 1375.7:  "In order to prevent the improper use of a health provider's contract when being sold, leased, or transferred, *every arrangement* that results in a payor paying a health care provider a reduced rate from billed charges for health care services based on the health care provider's participation in a network or panel shall be governed by the underlying contract between the health care provider and the contracting agent, *regardless of the terms of the contract between the contracting agent and the payor.*"  (Assem. Bill. No. 175 (2003–2004 Reg. Sess.), § 2 as amended Apr. 21, 2003, some italics omitted.)  This language, which would have supported Sutter's position, was not adopted.  (Assem. Bill No. 175 (2003-2004 Reg. Sess.), § 2 as amended Apr. 28, 2003; § 1375.7, subd. (d).)  "When the Legislature chooses to omit a provision from the final version of a statute which was included in an earlier version, this is strong evidence that the act as adopted should not be construed to incorporate the original provision."  (*People v. Delgado* (2013) 214 Cal.App.4th 914, 918.)  The previously referenced enrolled bill report explains why the broader language was not adopted:  "Blue Cross and Blue Shield are the two health plans that lease their provider networks to ERISA self-funded insurance health plans and their provider contracts are the underlying reason for this bill.  *Because ERISA self-funded employer health plans are preempted from state regulation by the federal ERISA, changing*

_____

*Medical Colleges* (2011) 193 Cal.App.4th 1047, 1061, fn. 10; accord, *Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1218–1219, fn. 3; but see *Joyce v. Ford Motor Co.* (2011) 198 Cal.App.4th 1478, 1492–1493 [criticizing the California Supreme Court's holding that enrolled bill reports are cognizable legislative history]; *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 41–42 [same].)  An enrolled bill report is "likely to reflect the understanding of the Legislature that enacted the statute . . . particularly because it is written by a governmental department charged with informing the Governor about the bill so that he can decide whether to sign it, thereby completing the legislative process.  Although these reports certainly do not take precedence over more direct windows into legislative intent such as committee analyses, and cannot be used to alter the substance of legislation, they may be . . . 'instructive' in filling out the picture of the Legislature's purpose."  (*Conservatorship of Whitley*, at pp. 1218–1219, fn. 3.)

*California law in a manner that would cause those contracts to be amended would be preempted by federal law. . . . The proposed amendments will not have this effect.*" (Cal. Business, Transportation & Housing Agency, Enrolled Bill Rep. on Assem. Bill No. 175 (2003–2004 Reg. Sess.), p. 5.) The legislative history makes clear section 1375.7, subdivision (d), was not intended to change the ASO Contract's terms by operation of law.

Sutter's reliance on *Pinnacle Museum* does not compel a contrary conclusion. In that case, a homeowners association sued a condominium developer for construction defects. (*Pinnacle Museum, supra,* 55 Cal.4th at pp. 231, 233.) The developer moved to compel arbitration, based on a clause in the recorded declaration of covenants, conditions, and restrictions providing that the association and the individual owners agreed to resolve any construction dispute with the developer through binding arbitration. (*Id.* at pp. 231, 232–233.) There was no dispute that the individual owners, who bought condominiums via purchase agreements referencing and incorporating the arbitration clause, were bound to arbitrate. (*Id.* at p. 233, & fn. 3.) The question was whether the association, which was not a party to the purchase agreements or in independent existence at the time the covenants, conditions, and restrictions were recorded, was similarly bound. (*Id.* at pp. 234, 240.)

A majority of our Supreme Court concluded that, under the statutory and decisional law pertaining to common interest developments, the covenants, conditions, and restrictions reflect written promises and agreements to which a developer and owners may bind the association. (*Pinnacle Museum, supra,* 55 Cal.4th at pp. 232, 241.) The court observed: "As discussed, the Legislature has crafted a statutory scheme providing for the capacity of a developer to create a condominium development subject to covenants and restrictions governing its operation and use. There appears no question that, under the Davis-Stirling Act, each owner of a condominium unit either has expressly consented or is deemed by law to have agreed to the terms in a recorded declaration. As the exclusive members of an owners association, the owners have every right to expect that the association, in representing their collective interests, will abide by the agreed-

18

upon covenants in the declaration, including any covenant to invoke binding arbitration as an expeditious and judicially favored method to resolve a construction dispute, in the absence of unreasonableness." (*Id.* at p. 241.)

*Pinnacle Museum* merely illustrates the following principle: "[T]he Legislature may devise reasonable rules in civil litigation to permit the delegation to another party of the power to consent to arbitration instead of a jury trial." (*Ruiz v. Podolsky* (2010) 50 Cal.4th 838, 853.) Other courts have similarly determined a nonsignatory bound to arbitrate due to statutory delegation of the power to consent to a party with whom the nonsignatory has a special relationship. (See *id.* at pp. 849, 852, 854, & fn. 5 [arbitration agreement specifically binding nonsignatory heirs also binding against wrongful death claimants under a statute clearly designed to permit patients to bind heirs in such actions].)

However, here, the Legislature has not indicated any intent to alter the obligations of third party payors, like UEBT, either in the plain language or legislative history of section 1375.7, subdivision (d). Nor has it delegated the power to bind such third party payors to "contracting agents," such as Blue Shield. UEBT cannot be deemed to have agreed to arbitrate by virtue of the statute. Accordingly, we need not reach UEBT's argument that any such interpretation is preempted by ERISA (29 U.S.C. § 1144(a)).

C. *Equitable Estoppel*

We find Sutter's common law theories no more persuasive. Sutter argues that equitable estoppel "reinforce[s]" section 1375.7, subdivision (d), and further prevents UEBT from avoiding arbitration of its claims. "In the arbitration context, a party who has *not* signed a contract containing an arbitration clause may nonetheless be compelled to arbitrate when he seeks enforcement of other provisions of the same contract that benefit him." (*Metalclad Corp. v. Ventana Environmental Organizational Partnership* (2003) 109 Cal.App.4th 1705, 1713 (*Metalclad*).)

"Under [the doctrine of equitable estoppel], as applied in 'both federal and California decisional authority, a nonsignatory defendant may invoke an arbitration clause to compel a signatory plaintiff to arbitrate its claims when the causes of action

against the nonsignatory are "intimately founded in and intertwined" with the underlying contract obligations.' [Citations.] 'By relying on contract terms in a claim against a nonsignatory defendant, even if not exclusively, a plaintiff may be equitably estopped from repudiating the arbitration clause contained in that agreement.' [Citations.] 'The rule applies to prevent parties from trifling with their contractual obligations.' " (*JSM Tuscany, LLC v. Superior Court* (2011) 193 Cal.App.4th 1222, 1237, fn. omitted.) Likewise, nonsignatories to an arbitration agreement may also be bound by the agreement on an equitable estoppel theory. (*Id.* at pp. 1239–1241; *Suh v. Superior Court, supra,* 181 Cal.App.4th at p. 1513; *Goldman v. KPMG, LLP* (2009) 173 Cal.App.4th 209, 220– 221, 229–234.) "When [a nonsignatory] plaintiff is suing on a contract—on the basis that, even though the plaintiff was not a party to the contract, the plaintiff is nonetheless entitled to recover for its breach, the plaintiff should be equitably estopped from repudiating the contract's arbitration clause." (*JSM Tuscany*, at pp. 1239–1240.) " '[T]he linchpin for equitable estoppel is . . . fairness.' " (*Goldman*, at p. 220.) "The doctrine thus prevents a party from playing fast and loose with its commitment to arbitrate, honoring it when advantageous and circumventing it to gain undue advantage." (*Metalclad, supra,* 109 Cal.App.4th at p. 1714.)

Sutter contends that UEBT is "seeking to retain . . . the benefits it receives under the Provider Contract while disavowing its obligations under that same contract." To the contrary, UEBT's complaint challenges the legitimacy of the terms of all "arrangements" negotiated by Sutter with Blue Shield and other network vendors, and argues they were part of Sutter's unlawful scheme to prevent price competition. In its complaint, UEBT is only seeking to enforce the UCL and the Cartwright Act, it is clearly not seeking to enforce or otherwise take advantage of any portion of the Provider Contract. In fact, UEBT seeks to enjoin Sutter from implementing the allegedly anticompetitive contract terms. The doctrine of equitable estoppel has no application. (See *McArthur v. McArthur* (2014) 224 Cal.App.4th 651, 658 [beneficiary of trust document containing arbitration clause is not bound when she argues trust is invalid and seeks to have it set aside].) UEBT did not play "fast and loose" with the commitment to arbitrate, "honoring

20

it when advantageous and circumventing it to gain undue advantage." (*Metalclad, supra,* 109 Cal.App.4th at p. 1714.)

We agree with the trial court that *DMS Services, supra,* 205 Cal.App.4th 1346 is on point. In that case, an employer entered into workers' compensation insurance agreements containing arbitration clauses with an insurance company. The employer also entered into separate agreements with a third party administrator to review and adjust workers' compensation insurance claims. None of the latter agreements contained an arbitration clause. Ultimately, the employer sued the third party administrator, alleging claims for breach of contract and tortious breach of the implied covenant of good faith and fair dealing based on the third party administrator's mishandling of claims. (*Id.* at pp. 1349–1350.) The trial court concluded that, under the doctrine of equitable estoppel, the third party administrator could compel arbitration even though it did not sign the insurance agreements. (*Id.* at pp. 1349, 1354.)

The reviewing court reversed. (*DMS Services, supra,* 205 Cal.App.4th at pp. 1354–1355, 1358.) It explained: "[The employer's] complaint alleges [the third party administrator] breached its administrator duties under the claims administration agreement; *it does not allege*, *nor could it against* [*the third party administrator*], a breach of the deductible or policy agreements to which [the third party administrator] is not a party. Similarly, it does not rely on any provision in those agreements to support its claims. [Citations.] Accordingly, there is no basis to find that the complaint against [the third party administrator] for breaching the claims administration agreement is 'intimately founded in' the deductible agreement containing the arbitration clause." (*Id.* at p. 1355, italics added & fn. omitted.)

The reviewing court also rejected the third party administrator's argument that the employer's claims were " 'inextricably intertwined' with the deductible agreements because those agreements give rise to [the employer's] claims—that is, [the third party administrator's] alleged breach of the claims administration contract caused [the employer] to owe more money to [the insurance company] under the deductible agreements." (*DMS Services, supra,* 205 Cal.App.4th at p. 1356.) The court observed,

21

"this argument confuses the concept of 'claims founded in and intertwined with the agreement containing the arbitration clause' with but-for causation. A standard indemnity claim, for example, does not exist *but for* the precursor action giving rise to it. Nevertheless, in those circumstances, the doctrine of equitable estoppel does not bind nonsignatory indemnitors to an arbitration agreement between the parties to the underlying action when, as here, the indemnity claims are not founded in the contract containing the arbitration provision and there is no preexisting relationship between the defendants on which to base an estoppel." (*DMS Services*, at pp. 1356–1357.) The court also recognized that the litigation would involve some interpretation of the insurance policy agreements, but concluded that overlap "is a far cry from claims grounded in, and 'inextricably intertwined with,' the arbitration agreement." (*Id.* at p. 1357.)

Here, too, UEBT is not seeking to enforce the terms or obligations of the Provider Contract, while at the same time seeking to avoid arbitration. UEBT's complaint does not specifically refer to the Provider Contract. Unlike in *DMS Services*, however, UEBT makes repeated reference to written agreements between Sutter and network vendors. The Provider Contract is one such agreement. Resolution of UEBT's claims may require reference to the terms of the Provider Contract, but "merely 'mak[ing] reference to' an agreement with an arbitration clause is not enough" to require arbitration. (*Goldman v. KPMG, LLP, supra,* 173 Cal.App.4th at p. 218.) This case does not present the unfairness that equitable estoppel is designed to avoid. The trial court did not err in concluding equitable estoppel inapplicable.

Nor did UEBT otherwise "accept the benefits" of the Provider Contract, as Sutter suggests.[13] Rather, UEBT entered into a separate contract with Blue Shield—the ASO Contract—under which it paid Blue Shield consideration in exchange for access to Blue

---

[13] Civil Code section 1589 does not support its argument: "A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, *so far as the facts are known, or ought to be known*, to the person accepting." (Italics added.) Sutter has not challenged the trial court's finding that UEBT never received the Provider Contract and was not aware of the arbitration agreement.

Shield's discounted provider rates. Blue Shield, to perform its own contractual obligations under the ASO Contract, provided UEBT with access to its provider network at the discounted rates it had separately negotiated.

In fact, Sutter specifically authorized Blue Shield to provide access to self-funded payors that actively encourage their health plan enrollees to choose a provider within the network. Blue Shield ensured that "[b]enefit payments made by [UEBT] to Contracted Providers shall be in accordance with the payment provisions in the contracts between Blue Shield and Contracted providers to the extent such payment terms are communicated to Client." And UEBT actively encourages its members to use providers within the preferred network. Sutter is receiving an increased client base in exchange for authorizing Blue Shield to extend network rates to third party payors.

D.    *Ostensible Agency*

Nor did the trial court err in rejecting Sutter's theory that Blue Shield was UEBT's agent in contract negotiations and thereby bound UEBT to the 2012 amendment of the Provider Contract. "An agency is either actual or ostensible." (Civ. Code, § 2298; see *id.*, § 2315.) " 'The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on his behalf and subject to his control.' [Citation.] In the absence of the essential characteristic of the right of control, there is no true agency . . . ." (*Edwards v. Freeman* (1949) 34 Cal.2d 589, 592.) Here, there is no actual agency. The ASO Contract makes clear that "each party . . . shall be considered an independent contractor, and not an employee, agent, partner, or joint venturer of the other party."

"An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." (Civ. Code, § 2300.) "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." (*Id.*, § 2317.) On appeal, Sutter suggests that UEBT's act of providing its members with Blue Shield cards, which they presented to Sutter, led Sutter to believe Blue Shield was UEBT's agent for all purposes. UEBT's use of Blue Shield cards,

23

combined with Blue Shield's provision of other "administrative service" responsibilities under the ASO Contract, may have suggested actions of an agent acting on behalf of a principal in plan administration. (See *Elfstrom v. New York Life Ins. Co.* (1967) 67 Cal.2d 503, 512 [employer is agent of insurer in administering employee group insurance policy]; *HCC Life Ins. Co. v. Managed Benefit Administrators LLC* (E.D.Cal. 2008) 2008 U.S.Dist. Lexis 46443.) But the question of agency in plan administration is distinct from whether an entity serves as an agent in contract negotiations. (See *Elfstrom*, at p. 512, fn. 5.)

Even if these acts suggested Blue Shield had some authority to act on UEBT's behalf in administering its plan, we fail to see how UEBT members' use of Blue Shield cards to obtain services from Sutter providers reasonably suggests that UEBT had authorized Blue Shield to bind UEBT to all terms of the Provider Contract. (See *Lindsay-Field v. Friendly* (1995) 36 Cal.App.4th 1728, 1734 ["persons dealing with an assumed agent are bound at their peril to ascertain the extent of the agent's authority"].) That Blue Shield may have led Sutter to believe it was so authorized is no matter. "Ostensible authority must be based on the acts or declarations of the principal and not solely upon the agent's conduct." (*Taylor v. Roseville Toyota, Inc.* (2006) 138 Cal.App.4th 994, 1005; accord, *Hilyar v. Union Ice Co.* (1955) 45 Cal.2d 30, 42.)

In the alternative, Sutter maintains that UEBT subsequently ratified Blue Shield's agency when a UEBT claims adjustor neglected to follow up on a "Provider Appeal," dated January 15, 2013. The "Provider Appeal" referenced Sutter's position that the terms and conditions of the Provider Contract "apply to BOTH Blue Shield and all payers[] accessing the Blue Shield contract," as well as specifically referencing Blue Shield's obligation to ensure that such other payors have agreed to be bound by the terms of the Provider Contract, including, but not limited to, "the Dispute Resolution and Binding Arbitration Process outlined in Exhibit 13."

An actual agency may be created by ratification. (Civ. Code, § 2307; *van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 571.) Ratification is "established by implication from the conduct and acts of the party in whose behalf the unauthorized

24

agency was assumed, inconsistent with any reasonable intention on his part, other than that he intended approving and adopting it." (*Ballard v. Nye* (1903) 138 Cal. 588, 597.) A principal may ratify an agency with full knowledge of all the facts (Civ. Code, § 2314; *Estate of Fletcher* (1940) 36 Cal.App.2d 567, 573), but "only in the manner that would have been necessary to confer an original authority for the act ratified." (Civ. Code, § 2310; *Lindsay-Field v. Friendly, supra,* 36 Cal.App.4th at p. 1736.) Sutter has not met this standard by presenting evidence that a UEBT claims adjustor was silent after receiving an incomplete reference to the mere existence of an arbitration agreement.

The trial court did not err in concluding UEBT is not bound to arbitrate. Accordingly, we need not address Sutter's final argument that the trial court erred in determining the arbitration agreement's scope.

### III.    DISPOSITION

The order denying Sutter's motion to compel arbitration is affirmed. UEBT is to recover its costs on appeal.

25

_____

BRUINIERS, J.


WE CONCUR:


_____

SIMONS, Acting P. J.


_____

NEEDHAM, J.


A143399

26

Superior Court of the City and County of San Francisco, No. CGC-14-538451, Curtis E. A. Karnow, Judge.

Jones Day, Craig E. Stewart, Matthew J. Silveira, Jeffrey A. LeVee; Quinn Emanuel Urquhart & Sullivan and John M. Potter for Defendants and Appellants.

Hooper, Lundy & Bookman, James F. Segroves and Glenn E. Solomon for California Hospital Association as Amicus Curiae on behalf of Defendants and Appellants.

Pillsbury & Coleman, Richard L. Grossman; Farella Braun + Martel, John L. Cooper, Roderick M. Thompson, Christopher C. Wheeler; Cohen Milstein Sellers & Toll, Kit A. Pierson, Daniel A. Small, Laura M. Alexander; Davis Cowell & Bowe, Steven L. Stemerman and Elizabeth A. Lawrence for Plaintiff and Respondent.

Mayer Brown, Robert E. Bloch and Christopher J. Kelly for California Physicians' Service as Amicus Curiae on behalf of Plaintiff and Respondent.