[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-12728
Non-Argument Calendar
_____

D.C. Docket No. 9:16-cv-81992-KAM


BRANDON LEIDEL,
individually and on behalf of all others similarly situated,

Plaintiff-Appellee,

JAMES D. SALLAH,
as Receiver/Corporate Monitor of Project Investors, Inc. d.b.a. Cryptsy,

Plaintiff,

versus

COINBASE, INC.,
a Delaware Corporation d.b.a. Global Digest Asset Exchange (GDAX),

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 23, 2018)

Before WILLIAM PRYOR, JULIE CARNES, and ANDERSON, Circuit Judges.

PER CURIAM:

Defendant Coinbase, Inc. ("Defendant") appeals the denial of its motion to compel arbitration. After careful review, we affirm.

## I.    BACKGROUND

### A.    Factual Background

Defendant is a financial services company registered as a money services business with the U.S. Department of the Treasury, Financial Crimes Enforcement Network. *See* 31 C.F.R. §§ 1010.100(ff), 1022.380. As part of its business, Defendant operates a website where its customers can purchase, exchange, and sell digital cryptocurrencies, such as Bitcoin. One of the services that Defendant provides is a "Conversion Service" through which its customers can convert their Bitcoin into cash. For a fee, Defendant will buy its customers' Bitcoin at a predetermined "Conversion Rate" published on its website.

In May 2013, Paul Vernon opened two accounts through Defendant's website—one for himself and one for his company, Project Investors, Inc., which did business under the name Cryptsy. Cryptsy was a cryptocurrency exchange where consumers could trade Bitcoin and other digital cryptocurrencies. Vernon was its founder, president, and CEO.

2

Cryptsy dealt exclusively in cryptocurrencies, and all of its customers' account balances were stated in Bitcoin denominations. Cryptsy utilized Defendant's website to convert Bitcoin into cash.

When Vernon opened the accounts through Defendant's website, he clicked a box to accept the terms of Defendant's User Agreement. When Defendant updated the terms of that agreement in December 2014, Vernon accepted the new terms, both on behalf of himself and on behalf of Cryptsy. Each iteration of the User Agreement contained an arbitration clause that provided, in relevant part, as follows:

> Except for claims for injunctive or equitable relief or claims regarding intellectual property rights (which may be brought in any competent court without the posting of a bond), any dispute arising under this Agreement shall be finally settled on an individual basis in accordance with the American Arbitration Association's rules for arbitration of consumer-related disputes and you and [Defendant] hereby expressly waive trial by jury. The arbitration shall take place in San Francisco, California, in the English language and the arbitral decision may be enforced in any court.

The 2014 User Agreement also contained a choice-of-law provision, which provided that the agreement would be governed by California law, "except to the extent governed by federal law."

Over the course of about three years, Vernon used Defendant's services to convert more than $8 million of Cryptsy's customers' Bitcoin into cash. That cash

3

was deposited by Defendant into Vernon's personal bank account. Vernon has since fled the country.

In early 2016, certain of Cryptsy's customers filed a class action lawsuit against Cryptsy and Vernon.[1] One of those customers was Brandon Leidel.[2] Early in those proceedings, the district court appointed a receiver to take control of Cryptsy.

### B.    Procedural History

Leidel and the receiver for Cryptsy filed this action against Defendant in December 2016. Leidel sought to represent a class of all Cryptsy customers whose money was stolen by Vernon through the use of Defendant's services. Leidel brought claims against Defendant for (1) aiding and abetting Cryptsy's breaches of its fiduciary duties to its customers; (2) aiding and abetting Vernon's theft of Cryptsy's customer's assets; (3) negligence in performing its duties as a depository of Cryptsy's and Vernon's accounts; and (4) unjust enrichment with respect to the fees that Defendant collected on the conversion of Bitcoin that rightfully belonged to Cryptsy's customers and was converted into cash that was deposited into Vernon's personal bank account. The receiver brought essentially the same claims

---

[1] We take judicial notice of the class action litigation against Cryptsy. *See United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (recognizing that a court may take judicial notice of a document filed in another court to establish the fact of such litigation and related filings).

[2] Although Leidel was not a named plaintiff in the original complaint, he was a named plaintiff in the amended complaints filed in the class action proceedings against Vernon and Cryptsy.

on his own behalf.   All of the claims were based to some extent on Defendant's alleged failure to (1) adequately monitor or investigate Cryptsy's and Vernon's use of Defendant's website; (2) detect Vernon's theft of Cryptsy's customers' Bitcoin; and (3) report suspicious activity by Vernon or Cryptsy to the appropriate authorities.  The plaintiffs alleged that Defendant had such duties under various federal statutes and regulations, particularly the Bank Secrecy Act, 31 U.S.C. § 5311 *et seq.*, and its implementing regulations, *see* 12 C.F.R. §§ 208.62–.63.

Defendant moved the district court to compel arbitration of all of the claims asserted in the complaint.  Defendant argued that the receiver was bound by the arbitration clause in the User Agreements that Cryptsy, through Vernon, entered into in 2013 and 2014 because the receiver merely stepped into the shoes of Cryptsy with respect to those agreements.

Defendant further argued that, under the doctrine of equitable estoppel, Leidel was also bound by the arbitration clause in the User Agreements entered into by Cryptsy and Vernon.  According to Defendant, Leidel's claims relied on there being some duty owed by Defendant to Cryptsy's customers, and that such a duty arose, if at all, under the User Agreements.  It further noted that it would have had no relationship with Cryptsy or Vernon in the absence of the User Agreements.  Accordingly, Defendant argued, all of Leidel's claims were "based upon" the User Agreements that established Cryptsy's and Vernon's accounts on Defendant's

website.  Notably, Defendant argued that Leidel was bound by the arbitration clause regardless of whether the district court applied Florida law or California law.

Shortly thereafter, Defendant and the receiver stipulated to the dismissal of the receiver's claims so that those claims could be pursued in arbitration.[3]  The district court later denied Defendant's motion to compel arbitration of the claims brought by Leidel.

Looking to Florida law, the district court reasoned that Leidel's claims did not arise under the User Agreements because Leidel was "not asserting any rights or benefits under" those agreements, which was evidenced (but not established) by the fact that Leidel had not brought a claim for breach of contract, but had instead alleged only tort claims.  The district court further reasoned that the User Agreements "had nothing to do with [Defendant's] alleged wrongful conduct," as any "indirect benefits" Leidel had received from Cryptsy's and Vernon's use of Defendant's services did not arise from the User Agreements, but instead arose "from the regulatory scheme under which Defendant operates."

Defendant appeals the district court's denial of its motion to compel arbitration of Leidel's claims.  We have jurisdiction under 9 U.S.C. § 16(a)(1)(B).

---

[3]  According to Defendant's initial brief on appeal, the receiver has not yet filed a demand for arbitration.

6

## II.    <u>DISCUSSION</u>

Defendant argues that, under the doctrine of equitable estoppel, Leidel is bound by the arbitration clause in the User Agreements entered into by Cryptsy and Vernon.  Notably, equitable estoppel is the only theory advanced by Defendant as to why Leidel should be compelled to arbitrate the claims he asserts in his class action complaint.  Furthermore, although Defendant contends that California law controls in this case, it argues that the outcome is the same regardless of whether California law, Florida law, or federal law applies.

State law controls on the issue of whether an arbitration clause in a contract can be enforced against a nonsignatory to that contract.  *See Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 845 F.3d 1351, 1354, 1355 n.1 (11th Cir. 2017); *Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1170 (11th Cir. 2011).  Accordingly, whether the User Agreements in this case can be enforced against Leidel—a nonsignatory to those agreements—under a theory of equitable estoppel is an issue of state law.  Because the outcome in this case is the same under both Florida law and California law, we need not decide which law applies.[4]

---

[4]  Leidel argues that Defendant waived any argument that California law applies in this case by failing to raise that argument in the district court.  However, in its motion to compel arbitration, Defendant noted that one of the User Agreements entered into by Vernon and Cryptsy—the 2014 User Agreement—contained a California choice-of-law provision.  Defendant also acknowledged that the other User Agreement did not contain such a provision, and argued that arbitration was required under both Florida's and California's doctrines of equitable estoppel.  We therefore conclude that Defendant did not waive its argument that California law controls, at least with respect to any claims allegedly covered by the 2014 User Agreement.

### A.    Standard of Review

We review *de novo* a district court's denial of a motion to compel arbitration.  *Kroma Makeup EU, LLC*, 845 F.3d at 1354.

### B.    Equitable Estoppel under Florida Law

Under Florida law, in order to compel arbitration under a theory of equitable estoppel, the party seeking to compel arbitration must show both that the plaintiff is relying on a contract to assert its claims and that the scope of the arbitration clause in that contract covers the dispute.  *See id.* (relying on *Koechli v. BIP Int'l, Inc.*, 870 So. 2d 940 (Fla. 1st DCA 2004)).  In analyzing the scope of an arbitration clause, Florida courts draw a distinction between clauses that require arbitration of claims "arising out of" the subject contract and those that require arbitration of claims "arising out of *or relating to*" the contract.  *See Jackson v. Shakespeare Found., Inc.*, 108 So. 3d 587, 593 (Fla. 2013) (emphasis in original).  The former are considered to be "narrow in scope" and apply only to "those claims that have a direct relationship to a contract's terms and provisions."  *Id.*  The latter are considered to be "broad in scope" and apply to "claims that are described as having a 'significant relationship' to the contract—regardless of whether the claim is founded in tort or contract law."  *Id.* (quoting *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 637–38 (Fla. 1999)).

"A 'significant relationship' between a claim and an arbitration provision does not necessarily exist merely because the parties in the dispute have a contractual relationship." *Id.*; *see also Seifert*, 750 So. 2d at 638 ("[T]he mere fact that the dispute would not have arisen but for the existence of the contract and consequent relationship between the parties is insufficient by itself to transform a dispute into one 'arising out of or relating to' the agreement."). Rather, a significant relationship exists between a claim and a contract "if the claim presents circumstances in which the resolution of the disputed issue requires either reference to, or construction of, a portion of the contract." *Jackson*, 108 So. 3d at 593. In other words, a claim "arises from the terms of the contract if it emanates from an inimitable duty created by the parties' unique contractual relationship." *Id.* "[A] claim does not have a nexus to a contract if it pertains to the breach of a duty otherwise imposed by law or in recognition of public policy, such as a duty under the general common law owed not only to the contracting parties but also to third parties and the public." *Id.*

In *Seifert*, the Florida Supreme Court held that a wrongful death claim did not fall within the scope of a broad arbitration provision contained in a purchase and sale agreement. *See Seifert*, 750 So. 2d at 635, 640–43. There, the Seiferts, a married couple, had contracted with a homebuilder for the construction of a house. *Id.* at 635. After the Seiferts moved in, they left their car running in the garage. *Id.*

9

The air conditioning system located in the garage picked up the car's carbon monoxide emissions and distributed them inside the house, killing Mr. Seifert. *Id.* Mrs. Seifert then sued the homebuilder for wrongful death on the theory that the homebuilder had negligently designed and built the home.[5] *Id.* The homebuilder moved to compel arbitration under an arbitration clause in the contract for sale of the home. *Id.* at 635–36.

The Florida Supreme Court determined that Mrs. Seifert's negligence claim for wrongful death did not fall within the scope of the contract's arbitration provision. *Id.* at 640–42. Among other things, the court noted that Mrs. Seifert's claim was based on the homebuilder's alleged "breach of its duty to exercise reasonable care in designing, manufacturing, and assembling new homes in a manner that would prevent the air conditioning unit from pulling in carbon monoxide from the garage and distributing it throughout the home." *Id.* at 641. That duty, the court noted, "would extend to anyone . . . who might be injured by [the homebuilder's] tortious conduct," not only to the purchaser of the house. *See*

---

[5] Mrs. Seifert brought the action in her capacity as personal representative of her husband's estate. *Seifert*, 750 So. 2d at 635. She initially brought claims for strict liability, negligence, and breach of express and implied warranties. *Id.* The strict liability and warranty claims were subsequently dismissed, leaving only the negligence claim for wrongful death. *Id.*

10

*id.* Accordingly, the court concluded that "the factual allegations in the complaint d[id] not rely on the contract" between the Seiferts and the homebuilder.[6] *Id.*

Here, Leidel's claims are based on Defendant's alleged failure to (1) adequately monitor or investigate Cryptsy's and Vernon's use of Defendant's website; (2) detect Vernon's theft of Cryptsy's customers' Bitcoin; and (3) report suspicious activity by Vernon or Cryptsy to the appropriate authorities. According to the complaint, these duties were imposed on Defendant by the Bank Secrecy Act and its implementing regulations not for the protection of Defendant's customers, but to detect money laundering and other suspicious or illegal activities by Defendant's customers. Because Leidel's claims rely on obligations allegedly imposed by law and in recognition of public policy to persons who are strangers to the User Agreements, his claims neither rely on nor bear a significant relationship to those agreements. *See Jackson*, 108 So. 3d at 593; *Seifert*, 750 So. 2d at 640–42.

Moreover, because the arbitration clause in Defendant's User Agreements is "narrow in scope" under Florida law, Defendant was required to show that Leidel's claims "have a direct relationship to [the User Agreements'] terms and provisions." *See Jackson*, 108 So. 3d at 593; *Shearson, Lehman, Hutton, Inc. v. Lifshutz*, 595

---

[6] Notably, the Florida Supreme Court found it "obvious[]" that "a guest or other person" injured by the homebuilder's negligent design of the house would not be bound by the arbitration clause in the Seiferts' contract. *Seifert*, 750 So. 2d at 641.

11

So. 2d 996, 997 (Fla. 4th DCA 1992). Because Leidel's claims do not have a "significant relationship" to the agreements, Defendant cannot show that those claims meet the more stringent "direct relationship" standard applicable to arbitration provisions that are narrow in scope.

Defendant points to *BDO Seidman, LLP v. Bee*, 970 So. 2d 869 (Fla. 4th DCA 2007), in support of its argument that Leidel should be equitably estopped from avoiding the arbitration clause in the User Agreements entered into by Vernon and Cryptsy. *Bee* is distinguishable. In *Bee*, the plaintiff sued for benefits that he was allegedly owed under a partnership agreement that he did not sign. 970 So. 2d at 872, 875. Florida's Fourth District Court of Appeal determined that, because the plaintiff sought benefits under a contract, he was estopped from denying that contract's validity, and could not avoid the contract's arbitration provision on the grounds that he had not signed the contract. *Id.* at 875.

Here, by contrast, Leidel does not seek to enforce the User Agreements entered into by Vernon and Cryptsy.[7] Because Defendant has failed to establish both that Leidel is relying on a contract to assert his claims and that the scope of the arbitration clause in that contract covers the dispute, Leidel is not equitably

---

[7] Indeed, because Leidel's claims allege that Defendant breached duties imposed by law with respect to its action or inaction regarding Vernon's use of its website, it would likely make little difference to Leidel's cause of action if the User Agreements were held to be invalid in their entirety.

estopped from avoiding the arbitration clause in Defendant's User Agreements. *See Kroma Makeup EU, LLC*, 845 F.3d at 1354.

### C.    Equitable Estoppel under California Law

Under California law, "[a] nonsignatory plaintiff may be estopped from refusing to arbitrate when he or she asserts claims that are 'dependent upon, or inextricably intertwined with' the underlying contractual obligations of the agreement containing the arbitration clause." *Jensen v. U-Haul Co. of Cal.*, 226 Cal. Rptr. 3d 797, 806 (Ct. App. 2017) (quoting *JSM Tuscany, LLC v. Super. Ct.*, 123 Cal. Rptr. 3d 429, 443 (Ct. App. 2011)), *pet. for review denied*, (Feb. 21, 2018).  The focus is on the nature of the claims asserted—that the claims are cast in tort rather than contract does not necessarily avoid the arbitration clause.  *Id.*; *see also Boucher v. Alliance Title Co.*, 25 Cal. Rptr. 3d 440, 447 (Ct. App. 2005). Rather, "*[t]he plaintiff's actual dependence on the underlying contract in making out the claim against the nonsignatory . . . is . . . always the* sine qua non *of an appropriate situation for applying equitable estoppel*."  *Jensen*, 226 Cal. Rptr. 3d at 806 (alterations and emphasis in original) (quoting *Goldman v. KPMG LLP*, 92 Cal. Rptr. 3d 534, 550 (Ct. App. 2009)).  Thus, "[e]ven if a plaintiff's claims 'touch matters' relating to the arbitration agreement, 'the claims are not arbitrable unless the plaintiff relies on the agreement to establish its cause of action.'"  *Id.* (quoting *Goldman*, 92 Cal. Rptr. 3d at 551).

In *Jensen*, an employee was injured when the truck rented by his employer from U-Haul Co. of California ("U-Haul") blew a tire while the employee was driving it. *Id.* at 800. The employee sued U-Haul on the theory that it had negligently maintained the truck.[8] *Id.* Although the employee was acting within the course and scope of his employment when he was injured, California's Fourth District Court of Appeal concluded that the employee was not bound by an arbitration agreement in the rental contract signed by his employer. *Id.* at 800–01, 807.

The court first concluded that there was "no doubt" that the employee's claim fell within the scope of the arbitration agreement, as the agreement purported to cover all claims related in any way to the rental, including claims brought by employees of the signatory and all authorized or unauthorized users of the truck. *Id.* at 801. The only question, then, was whether the employee was bound by an agreement that he did not sign. *Id.*

With respect to equitable estoppel, the court concluded that the employee was not estopped from refusing to arbitrate because his negligence claim was "'fully viable without reference to the terms' of the rental agreement." *Id.* at 806 (quoting *Goldman*, 92 Cal. Rptr. 3d at 551). Accordingly, because the employee

---

[8] The employee's spouse also brought a claim against U-Haul for loss of consortium. *Jensen*, 226 Cal. Rptr. 3d at 800. In addressing U-Haul's argument that the plaintiffs should be required to arbitrate under a theory of equitable estoppel, California's Fourth District Court of Appeal analyzed both the employee's claim and his spouse's claim together and reached the same conclusion with respect to both claims. *See id.* at 806–07.

did not rely or depend on the terms of the rental agreement to make out his claim against U-Haul, California's Fourth District Court of Appeal concluded that "the basis for equitable estoppel—relying on an agreement for one purpose while disavowing the arbitration clause of the agreement—[was] completely absent."[9] *Id.* at 806–07 (quoting *Goldman*, 92 Cal. Rptr. 3d at 551).

Similarly, in *UFCW & Employers Benefit Trust v. Sutter Health*, 194 Cal. Rptr. 3d 190 (Ct. App. 2015), California's First District Court of Appeal concluded that a plaintiff was not equitably estopped from avoiding an arbitration clause in a contract that it did not sign. In *Sutter Health*, the plaintiff, a health care employee benefits trust, contracted with Blue Shield of California to obtain access to Blue Shield's provider network at the rates Blue Shield negotiated with health care providers. 194 Cal. Rptr. 3d at 193. One of the providers with whom Blue Shield had a contract was Sutter Health. *Id.*

The plaintiff sued Sutter Health alleging that its contracts with network vendors, such as Blue Shield, contained anticompetitive terms that insulated Sutter

---

[9] Notably, California's Fourth District Court of Appeal observed that, had the employer "alleged injuries similar to those allegedly suffered by [the employee], and he asserted similar claims, he would [have been] required to arbitrate the matter because of the dispute's 'roots in the relationship between the parties which was created by the contract' and the broad language of the arbitration agreement at issue." *Id.* at 807 (quoting *Berman v. Dean Witter & Co.*, 119 Cal. Rptr. 130, 133 (Ct. App. 1975)). Because the employee was not a signatory to the contract, however, "a different analysis" applied to his claim, one that required the court to determine whether the claim was "so dependent on and inextricably intertwined with the underlying contractual obligations of the agreement containing the arbitration clause that equity require[d] th[e] claim[] to be arbitrated." *Id.*

Health from competition and drove up the cost of health care. *Id.* Sutter Health sought to compel arbitration under an arbitration clause in the provider contract signed by Sutter Health and Blue Shield. *Id.* at 194.

California's First District Court of Appeal concluded that the plaintiff could not be compelled to arbitrate under a theory of equitable estoppel because the plaintiff was not seeking to enforce the contract containing the arbitration clause. *Id.* at 206. Rather, the plaintiff was seeking to enjoin Sutter Health from implementing certain allegedly anticompetitive contract terms. *Id.* In other words, the court observed, the plaintiff sought only to enforce California's law regulating competition. *See id.* at 193–94, 206. Because the plaintiff did not seek to enforce the terms or obligations of the relevant contract, the court concluded that the "doctrine of equitable estoppel ha[d] no application" to the case. *Id.* at 206.

Here, Leidel does not seek to enforce the terms or obligations of the User Agreements entered into by Vernon and Cryptsy. Instead, Leidel seeks to enforce obligations allegedly imposed on Defendant by federal statutes, federal regulations, and state common law. Because Leidel does not rely on the User Agreements to establish his cause of action, he is not estopped from avoiding the arbitration clauses in those agreements under California law. *See Jensen*, 226 Cal. Rptr. 3d at 806–07; *Sutter Health*, 194 Cal. Rptr. 3d at 205–07.

16

To avoid this conclusion, Defendant relies primarily on *Molecular Analytical Systems v. Ciphergen Biosystems, Inc.*, 111 Cal. Rptr. 3d 876 (Ct. App. 2010). In that case, the plaintiff licensed certain technology rights to Ciphergen Biosystems, Inc. ("Ciphergen") in exchange for the payment of royalties. *Id.* at 882–83. Ciphergen subsequently assigned its rights under the license agreement to Bio-Rad Laboratories, Inc. ("Bio-Rad"). *Id.* at 883. However, Ciphergen failed to secure the plaintiff's consent to the assignment, as required by the agreement. *Id.* The plaintiff sued both Ciphergen and Bio-Rad for claims related to the assignment. *Id.* As to Bio-Rad, the plaintiff brought claims for, among other things, interference with contract and conversion. *Id.*

California's Sixth District Court of Appeal concluded that the plaintiff was equitably estopped from refusing to arbitrate with Bio-Rad. *Id.* at 886–87, 893–96. With respect to the interference claim, the court noted that the plaintiff had alleged that Bio-Rad interfered with the license agreement "by soliciting and facilitating the purported assignment of" the technology covered by that agreement without the plaintiff's consent. *Id.* at 894–95. Because that claim actually relied on and referred to the license agreement, it was arbitrable under that agreement. *Id.* at 895. With respect to the conversion claim, the court noted that the plaintiff had alleged (1) its ownership of the relevant technology rights; (2) that the rights were "covered under the License Agreement"; and (3) that Bio-Rad had "converted to

17

its own use and benefit [the plaintiff's] rights and property without [the plaintiff's] consent." *Id.* Based on those allegations, the court concluded that the conversion claim was "rooted in the License Agreement and intimately intertwined with it." *Id.* Accordingly, the plaintiff could not avoid the arbitration obligation imposed by the agreement. *Id.* at 894–95.

This case is distinguishable from *Molecular Analytical Systems*. Here, as explained above, Leidel does not seek to enforce the terms of the User Agreements, nor does he allege any tort rooted in an allegation that Defendant breached or facilitated a breach of any obligation uniquely imposed by those agreements. In other words, Leidel's claims are viable, if at all, without reference to the User Agreements, as the duties Defendant allegedly breached were not imposed by those agreements. *See, e.g.*, *Jensen*, 226 Cal. Rptr. 3d at 806–07. In *Molecular Analytical Systems*, by contrast, the plaintiff's claims were rooted in an allegation that Bio-Rad had solicited, facilitated, and accepted an assignment that was prohibited not by law, but by the terms of a contract. *Molecular Analytical Sys.*, 111 Cal. Rptr. 3d at 883, 894–95. Therefore, *Molecular Analytical Systems* is distinguishable from this case, and Leidel is not equitably estopped from refusing to arbitrate his claims against Defendant.

18

## III.    <u>CONCLUSION</u>

For the reasons explained above, we **AFFIRM** the decision of the district court.